## TEETERS v. FROST et ux.

No. 19362.  Opinion Filed Oct. 21, 1930.

Ross & Thurman and Keaton, Wells & Johnston, for plaintiff in error.

Gomer Smith, for defendants in error.

HALL, C.  This action was instituted by plaintiffs, Wylie Frost and Mattie Frost, husband and wife and the father and mother of Lewis Frost, a minor, to recover damages for the alleged wrongful death of said Lewis Frost, in which it was claimed that he died from the effects of a blow received in a prize fight promoted and conducted by the defendant and plaintiff in error herein, Tol Teeters.

The essential facts are as follows: Plaintiffs Wylie Frost and Mattie Frost were the parents of Lewis Frost, who, at the time of his death, was 19 years of age.  The defendant, Tol Teeters, was the operator of some moving picture theaters, one of which was located in Oklahoma City and is known as the "Palace Theater."  He supplemented his moving picture attractions with amateur prize fights, or what he and his witnesses were pleased to call "fights" between amateurs, generally young men who were willing to do hard fighting for small pay.  He paid them the sum of $1 each whether they won or lost.  Their limit was about three or four rounds, when, in case there had not been a "knockout," the referee would decide who was the winner.  On the night that Lewis lost his life, he was booked or scheduled to fight, at this theater, some other amateur who did not show up on the scene.  Another fighter was there with whom Frost fought and lost to his death.  This young man was named Byron Boyer.  Byron was booked to fight one "Speedy Culberson," the "grand champion of the Oklahoma National Guard."  Culberson did not appear and Boyer and young Frost, after a consultation with defendant, agreed to fight, and engaged in what later proved to be a mutual mortal combat.  However, there was nothing to suggest malice or any evil intent other than the violation of a penal statute; and neither intended to inflict upon the other any serious bodily injuries other than those injuries that usually or often accompany a prize fight.  These fights or performances were conducted on the stage in the presence of the audience.  In fact, they were a part of the show and were advertised as such.  They had a referee who counted time on them, and usually the stage was roped—perhaps to give greater color and more realism to the fistic encounter.

Young Frost and Boyer commenced fighting at the sound of the gong, and fought about one minute or one and one-half minutes, during which time some blows to the head were exchanged.  Boyer, at that time, was attempting to terminate the matter by driving home to Frost a solar plexus blow —a severe blow directly in front, in the

region of the upper part of the stomach. He testified that he did not think that he hit Frost exactly in that spot; that it was his opinion that he struck to the right, because, to use his own conclusion, if he had hit Frost in the solar plexus, he would have instantly paralyzed him. When Frost received this blow he backed off, and Boyer hit him another blow under the chin or jaw. Frost reeled a little and then fell to his knees, then crumpled up and fell on his face. The referee saw that he was in a critical condition and did not call full time on him, but instead called an ambulance. Frost died before he reached the hospital. No post mortum examination was held upon his body, although Dr. Barker, who was introduced as a witness for defendant, saw his body at the undertaking parlors, and from his observations of the body and the history of the incidents in connection with his death, stated that he died of acute dilation of the heart. Dr. Barker also stated that acute dilation of the heart can be produced by intense excitement and exertion from making a considerable overstrain. He also stated in response to questions on cross-examination, that a blow in the region of the heart of sufficient force to knock one down, might easily produce acute dilation of the heart and might easily result in death. Those who examined deceased did not find any bruised condition on his body; and, in this connection, the doctor testified that, if Frost had a broken-down condition of the heart walls, or some serious arterial condition, it would have been possible for a blow on his body, sufficient to cause his death, to have been inflicted without leaving any mark or any indication of it.

Another medical man, Dr. Ross D. Long, testified essentially to the same thing, and in answer to a hypothetical question which assumed that Frost had a weak or questionable heart, said that a considerable blow in the solar plexus would most likely produce death.

Plaintiff sought recovery in the sum of $25,000; and the jury returned a verdict signed by three-fourths of the jurors in favor of plaintiffs, and against the defendant for $5,000, the theory of recovery being that the plaintiffs lost the services of their son.

The case is before us under numerous assignments of error. The principal controversy, however, pivots around the question as to whether or not the engagement or performance engaged in immediately in connection with the death of Lewis Frost was a prize fight or some other fight prohibited by statute, or whether it was an athletic play or sport termed by some as a "sparring match."

Except in the state of Louisiana, where certain classes of boxing contests are designated as "sparring matches," and expressly exempted from the operation of the prize fight statute, the question is no longer an open one in this country. Anyway, after the case of Sampson v. State, decided in January 1921, by the Criminal Court of Appeals of this state, and reported in 18 Okla. Cr. 191, 194 Pac. 279, defendant's contention has been foreclosed. In deciding this question, Justice Matson, of the Criminal Court of Appeals, summarized the acts which comprise a prize fight in the following language:

"In our opinion a 'ring or prize fight' had a well-defined meaning at the time of the adoption of the statute, and that it was the intention of the law-makers to prohibit the instigation and promotion of such contests as they were generally understood by the public at large, and not in the technical sense contended for by counsel for appellant. Webster defines a prize fight to mean 'an exhibition contest of pugilists for a stake or reward'; and the Century Dictionary defines the same term as 'A pugilistic encounter or a boxing match for a prize or wager.' See Seville v. State, 49 Ohio St. 117, 30 N. E. 621, 15 L. R. A. 516; People v. Taylor, 96 Mich. 576, 56 N. W. 27, 21 L. R. A. 287; Com. v. Barrett, 108 Mass. 302; State v. Patten, 159 Ind. 248, 64 N. E. 850. In Commonwealth v. McGovern, 116 Ky. 212, 75 S. W. 261, 66 L. R. A. 280, it is held: 'The fact that the reward is to be equally divided between the combatants in a prize fight does not legalize the transaction.' Also: 'The use of gloves by combatants in a prize fight will not make the contest any less a violation of the statute.'"

In setting forth the essential elements of the term "prize fight," the authors of R. C. L. vol. 8, secs. 349, 350, gleaned from the authorities the law, which has been applied elsewhere as well as here, as follows:

"The term 'prize fight' has no technical legal meaning, but as commonly understood it is a pugilistic encounter or boxing match for a prize or wager. The term is used in statutes against prize fighting in its ordinary signification, and includes all fights for a prize or reward in which the contestants intend to inflict some degree of bodily harm on each other. It has been held by the courts of some states, in construing the statute of the particular jurisdiction against prize fighting, that while, no doubt, it is one of the purposes of such statutes to prohibit public exhibitions of prize fighting, because they tend to incite quarrels and breaches of the peace, it is none the less its purpose to suppress all prize fighting, on account of its brutality and consequent danger to human

life, and its demoralizing tendencies and pernicious effects on the peace and good order of society, and hence that it is not an essential ingredient of the crime of engaging in a prize fight, unless the statute so specifies, that it take place in public. So, also, it has been held that it not material whether the victor in the contest is to receive more of the reward offered than the vanquished."

This same treatise cites the case of State v. Olympic Club, 46 La. Ann. 935, 15 So. 190, 24 L. R. A. 452, as supporting the following text:

"In some jurisdictions the effectiveness of such a statute is practically nullified by the statutory permission to engage in sparring or boxing exhibitions under easily complied with conditions."

We have no such a statute in Oklahoma. In fact, our statute goes farther, or is more all-embracing than most other statutes, because the Oklahoma statute against prize fighting—section 2015 C. O. S. 1921—in addition to making it an offense to instigate, to engage in, encourage or promote any ring or prize fight, uses the term "or any other premeditated fight" etc. However, this particular provision of the statute is not applicable here for the controversy under consideration was either a prize fight, or it was not a prize fight.

The plaintiff in error, or as we will hereinafter designate him, the defendant, contends that the fight engaged in by Frost at the Palace Theater on the night under consideration was not a fight—that it was either an athletic contest or exhibition for sport or a "sparring match," or something in its nature wholly harmless indeed.

The evidence and surrounding circumstances in the case do not bear out that contention. Byron Boyer, the person with whom Frost fought on the night of the fatal occurrence, testified for the plaintiff as follows:

"Q. How many times had you been fighting down at the Palace Theater? A. Three times, I think it was. Q. What were you doing down there? A. Boxing. Q. Boxing? Were you sparring or boxing? A. Well, I don't know whether you would call it sparring or not. We was throwing them in there pretty fast. Q. And when you are boxing, what are you doing? A. Well, you don't slap, I will tell you that. You would know that you were (not) slapped if you got hit. Q. And the thing you are trying to do is cool the other fellow off before he cools you off; is that the idea? A. That's the point. Q. On this night of the 5th of April, 1927, who were you supposed to go up against down at the Palace Theater? A. Speedy Culberson. Q. Who is he? A. He was another

boxer, but at the present time he is State National Guard champion of Oklahoma. Q. And he is what you call a prize fighter, isn't he? A. Yes, sir. Q. All right; how many rounds were you going? A. Three. Q. Did you have seconds? A. Yes, sir. Q. Who was the referee? A. Johnny Ryan. Q. What kind of gloves did you use? A. Six ounce. Q. Six ounce gloves is what are ordinarily used in prize fights, aren't they? A. Yes, sir. Q. When you have a boxing exhibition you usually use what they call a pillow, big glove? A. Well, for sparring, yes, sir; when you don't want to hurt a man, you use about a twelve-ounce glove."

Speaking of the fight, Frost's last fight, the witness said:

"A. At the beginning the referee called us out and gave us instructions and at the bell we started the fight, or started a round, and at the bell we would quit again. At the end of three rounds, which we went, or was supposed to go this night, as the rest of the fights was three rounds, the judge or referee gave his decision. * * * A. I hit him four or five times; yes sir. Q. Where did you hit him? A. Well, the last blow was a left hook to the jaw. Q. Well, Byron, did you hit him in the body? A. I believe I hit him in the body once. Q. To refresh your recollection, when you hit him on the jaw, he started to fall, didn't he? A. He backed off. Q. And as he backed off, you hit him in the body, didn't you? A. No. I hit him in the body next to the last punch, was when I hit him in the body. Q. Next to the last time? A. Yes, sir. Q. Where were you trying to hit him in the body? A. Solar plexus. * * * Q. Did you hit him there? A. No, sir. I must have missed, because if I had I would have paralyzed him and would have knocked him out. Q. Where did it hit? A. It must have landed to the right. Q. Landed to the right? A. From me. Q. Did it land up above or down below the point of the solar plexus? A. Well, I couldn't say to that, because I didn't pay any particular attention to whether it hit above or below. You have got to snap back and be on guard and you can't take notice of those things, to where every punch landed, every blow."

The testimony also particularized the acts and conduct of the referee on that night and other nights. It disclosed essentially the same formality as well as much of the same action that accompanied the big fight where the mighty Dempsey in a pugilistic encounter met and conquered Firpo, the "Wild Bull of the Pampas." In the face of these facts and the undisputed law applicable thereto, this contention of plaintiff in error, that a prize fight was not put on or "pulled off" that night, is without merit. Simply calling a prize fight an athletic exhibition or amateur contest or sparring match, or some like name, does not render it any the less a prize fight when the facts clearly bring it within

the meaning of a prize fight as defined by the statutes and the decisions interpreting them.

It is next contended that the court erred in his instruction to the jury on the question of contributory negligence. Whatever error was committed in this respect was committed in favor of the defendant and against the plaintiffs. There was absolutely no evidence or contributory negligence of plaintiffs' intestate; but the trial court out of an abundance of precaution, gave to the jury an instruction on contributory negligence, leaving the question to be decided by the jury, not only the question of contributory negligence, but the question of whether there had been introduced any evidence in that respect.

It is next contended by defendant that the rule of assumption of risk applies in this case; that, by reason of the fact that plaintiffs' intestate voluntarily entered into a mutual combat with Boyer to fight, his next of kin or personal representatives cannot recover damages for injuries received in the combat which he entered into by his own consent.

A few jurisdictions adhere to such doctrine, but the courts in the majority of the jurisdictions hold to the other view.

The law governing the assumption of risk or making the assumption of risk a defense in an action in tort applies only when there are contractual rights. It can scarcely be contended that one could contract against the teeth of a criminal statute or any statute prohibitory in its nature. This was decided as early as 1821 in the case of Stout v. Wren. 8 N. C. 420, 9 Am. Dec. 653, where the plaintiff in a civil action for damages had entered into a mutual combat with defendant, and agreed "to clear him. the defendant, of the law." Notwithstanding this agreement, the defendant was held liable for damages inflicted. This point is well illustrated by the language of the court in the leading case of McNeil v. Mullin, 70 Kan. 634, 79 Pac. 169, as follows:

"The state is wronged by this, and forbids it on public grounds. If men fight, the state will punish them. If one is injured, the law will not listen to an excuse based on a breach of the law. There are three parties here: one being the state, which for its own good does not suffer the others to deal on a basis of contract with the public peace. The rule of law is therefore clear and unquestionable that consent to an assault is no justification. The exception to this general rule embraces only those cases in which that to which assent is given is matter of indifference to public order, such as slight batteries in play or lawful games—such unimportant injuries as, even when they constitute technical wrongs, may well be overlooked and excused by the party injured, if not done of deliberate malice."

The above language comprises the text on the subject-matter in 2 R. C. L., p. 562. To the same effect is the language of Corpus Juris, vol. 5, p. 630.

It is next contended that the court erred in not more particularizing his definition of a prize fight. There is no merit in that contention. The court, in addition to submitting the statute on prize fighting, which would have been sufficient even in the prosecution of a person for violating the statute, followed the amplifying language of the Criminal Court of Appeals of this state in the case of Sampson v. State, supra, in that he instructed the jury as follows:

"You are instructed that a 'ring or prize fight' as used in section 2015, Statutes 1921, means an exhibition contest of pugilists for a stake or reward, and the fact that the reward was to be equally divided between the combatants would not legalize the transaction. And in this connection, you are instructed that a 'ring or prize fight,' such as is prohibited by said section 2015, means such a contest as it is generally understood so to be by the public at large."

The instructions in this case were as definite as it would have been possible to make them. The language of a text of recognized general authority, 38 Cyc. 1598, on the particular point, is as follows:

"The laying down of the law in the words of the law itself should not be pronounced to be error."

This is the general rule, and it is always applicable where the statute is not incomplete and is not susceptible to any clearer statement than in the language in which it was formulated.

The next contention is that the court committed error in not giving defendant's requested instruction No. 7, which instruction was as follows:

"You are instructed that, under the law, no right of recovery lies against the operator of a theater for death of an employee from a blow struck in a friendly sparring match entered into in a spirit of play, if the defendant operating the theater was not chargeable with recklessness or negligence in the premises."

This would have been a proper instruction if there had been any facts upon which to base it. There was no evidence in this record—substantial evidence or otherwise—that the conflict in which young Frost lost his life was a "friendly sparring match entered into

in a spirit of play" or a friendly sparring match in any other spirit. The boy who fought Frost described a prize fight in all its essential features; and in the course of the testimony of the defendant, the following was submitted:

"Q. Now, Mr. Teeters, on Tuesday nights down at your show you had what you called boxing nights or fight nights, didn't you? A. We called it amateur prize night, or amateur contest, boxing and sparring. * * * Q. Didn't they use ropes down there? A. Yes, they have used ropes. Q. But, as a matter of fact, you put ropes up in the middle of the stage, which was a sort of squared circle, didn't you? A. Put one rope up sometimes. * * * Q. And did you exhibit them in their clothes, or were they stripped off as fighters in a prize ring? A. They were stripped to some kind of a uniform, I don't know just what. Q. Well, as a matter of fact, they had on trunks and shoes, didn't they? A. I think they did. Q. They were clothed, so far as their uniform was concerned, just like any prize fighter would be ordinarily clothed? A. I don't know how prize fighters are clothed."

The defendant did not think much of that term "prize fight," but preferred to use the words "amateur boxing contest" and "sparring match," but he, himself, if we for the moment forget the testimony of the witness Boyer, and take into consideration the surrounding circumstances, describes a prize fight instead of a "sparring match," which the witness Boyer said was a "slapping contest" engaged in between two persons wearing twelve ounce gloves, instead of six ounce gloves, and that you would know the difference between a slap with a twelve ounce glove and a punch with a six ounce glove if you got hit instead of slapped. There is nothing in this entire testimony which would identify that unfortunate controversy as a friendly sparring match except designating it so by name. To say that a prize fight may be vividly described as such, and then its nature changed by designating it by some mild or euphonious term, would be like describing a wild poker game and then terming it a Sunday School. This requested instruction was properly refused.

Next, it is contended that the court committed reversible error in permitting a certain hypothetical question to be asked regarding the cause of the death of plaintiffs' intestate. Under this proposition or assignment of error, it is contended that plaintiff did not show that the fight or engagement or contest with Boyer was the proximate cause of his death.

In our original statement of fact heretofore given, we quoted the testimony of defendant's own witness, Dr. Barker, as to the physiological cause of the death of young Frost. The particular part of the hypothetical question objected to was the fact that the attorney for plaintiff assumed that Frost was hit in the solar plexus, and that he had not had much training as a boxer.

The extent of his training for boxing is immaterial, as that question could arise only where the combat would be within the law and where it would be necessary to bring home to defendant actual negligence in pitting him against a fighter of considerable experience and training. That question is out of this case.

The next objection urged under this assignment is that the hypothetical questions assumed that the deceased had a weak heart, or at one time had a sinking spell due to improper heart action. The evidence is undisputed that plaintiff had a fainting or sinking spell about one year before his death.

The other objection relates to the questioner assuming a particular place on deceased's body where the blow was delivered. In this connection, we must say that, in view of the testimony of Boyer, heretofore quoted, to the effect that he was endeavoring to hit the deceased in the solar plexus, and that he hit him one blow thereabouts, and advancing the opinion that his blow must have landed to the right, and basing that opinion or assumption only upon the fact that if his blow had struck in its intended spot he would have instantly paralyzed the deceased, and the further fact that his testimony indicates that he was so busy at that time that he could scarcely know the exact spot where he hit him, and he says so in words to that effect, we can reasonably infer that he was hit on or somewhere near the solar plexus. Anyway, it becomes immaterial because the testimony of Dr. Barker, in connection with the physical facts and testimony of lay witnesses in regard to what Frost did just before and at the time of his collapse, was sufficient to submit the question of proximate cause of his death to the jury, upon substantially the hypothetical question propounded by the attorney for plaintiffs. As the basis for a hypothetical question, the only requirement is that the testimony must tend to prove the material facts assumed. Where there is room for a difference of opinion among reasonable men as to the ultimate facts, the truth of the facts assumed is for the jury. Stated in the language of a noted commentator on the law of evidence, Jones' Commentaries on Evidence (2nd Ed.) vol. 3, p. 2427:

"The truth of facts assumed by the question is, in doubtful cases, a question for the

jury. If they find that the assumed facts are not proved, they should disregard the opinions based on such hypothetical questions; and the court will so instruct them."

The next objection is directed at certain alleged misconduct of the attorney in the case. This alleged misconduct consisted of a remark made in the argument of the attorney for plaintiffs, which remark, in substance, was that the witnesses had been besieged by claim agents, adjusters and attorneys. The remark was apparently prompted by the fact that one of the attorneys, or some person acting for the defendant, had gone to the witnesses, Byron and Myron Boyer, and had procured statements and affidavits from them purporting to give a detailed account of the unfortunate occurrence. Plaintiffs used these witnesses to make their case against the defendant. The attorney for plaintiffs, in the course of his argument, stated that it was necessary for him to use the witnesses subpoenaed by defendant, and that the "witnesses had been swooped down upon by claim agents, adjusters, and other persons." The particular word objected to was the reference to "adjusters." In this connection defendant contends that the word "adjuster" is generally understood as the representative of an insurance company, and that remark perhaps conveyed to the jury an intimation that the defendant would be indemnified by a policy of insurance.

While we must say that the remark had no place in the argument of the case, and under certain circumstances where a case is close such a remark might be, and perhaps would be, a contributing cause for the reversal of a favorable judgment, yet the single reference here was too remote and too far-fetched to attribute to it any independent pernicious effect. The verdict of the jury—$5,000 for the death of a young man—does not reflect a "finding influenced by passion or prejudice."

Under this assignment of error, the defendant also complains of certain misconduct of the jury. This misconduct was sought to be established by numerous affidavits of the jurors. These affidavits accompanied the motion for a new trial, and were to the effect that one juror stated in the jury room that he heard a man in the corridor of the courthouse say that an insurance company had offered to compromise the case by paying the plaintiffs $12,000.

The contention is without legal merit, for the reason that it has become a fixed rule in this jurisdiction that a juror cannot impeach his verdict by affidavits or by testimony even in open court. Except in one case, Carter State Bank v. Ross, 52

Okla. 642, 152 Pac. 1113, which was overruled in Egan v. First National Bank of Tulsa, 67 Okla. 168, 169 Pac. 621, the foregoing rule has been consistently followed throughout the entire history of this state and territory. Egan v. First National Bank, supra; Oklahoma City v. Stewart, 76 Okla. 211, 184 Pac. 779; Hale v. Streeter, 91 Okla. 107, 216 Pac. 154.

The rule is based upon what is termed sound public policy. The Supreme Court of the United States, in McDonald v. Pless, 238 U. S. 264, 35 Sup. Ct. 783, 59 L. Ed. 1300, speaking to this point, very aptly said:

"The argument in favor of receiving such evidence is not only very strong, but unanswerable, when looked at solely from the standpoint of the private party who has been wronged by such misconduct. The argument, however, has not been sufficiently convincing to induce Legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' "

We find no substantial error committed in the trial of this cause. The judgment of the trial court therefore is affirmed.

TEEHEE, LEACH, and REID, Commissioners, concur.

HERR and EAGLETON, Commissioners, dissent.

DIFFENDAFFER, Commissioner, absent.

BENNETT Commissioner, disqualified and not participating.

ANDREWS, J., dissents.

By the Court: It is so ordered.

Note.—See under (2) anno. 6 A. L. R. 388; 30 A. L. R. 199; 47 A. L. R. 1092; 2 R. C. L. p. 574; R. C. L. Perm. Supp. p. 506.