[File No. 7121]

HENRY KLUNDT, as Executor of the Estate of Margaretha
Hoffman, Deceased, Appellant, v. CHRISTINA PFEIFLE,
Respondent.

(41 NW2d 416)

Opinion filed February 23, 1950

Rittgers & Hjellum, for appellant.

J. A. Coffey, for respondent.

GRONNA, Dist. J. This action to quiet title is here for trial de novo. On July 1, 1947, the plaintiff, Margaretha Klundt Hoffman, a widow, age seventy-six, commenced this action against her only daughter, Christina Pfeifle, the defendant, a widow, age fifty-two. Each party claimed to be the owner of the real estate involved, all of which is situated in Stutsman County and represented all of the mother's property holdings.

The defendant alleges that she obtained title through conveyances from her mother, namely, three deeds, Exhibits 1, 2 and 3, one of which, Exhibit 1, was allegedly executed in 1944 and the other two on different dates in 1946, and all were allegedly acknowledged before the same notary public.

The principal issue is whether the alleged grantor signed the three deeds. Plaintiff denies the execution of the deeds, and, accordingly, the burden is upon the plaintiff to prove this negative issue. 20 Am Jur, Evidence, sec 139; 31 CJS, Evidence, sec 112. There was a sharp conflict in the testimony upon this issue. The trial court resolved the conflict in favor of the grantee (daughter) by finding that the grantor (mother) had, in fact, signed the deeds and acknowledged her signature before a notary public.

On July 14, 1947, because of advanced age, overweight, and physical infirmities (aggravated by a broken leg in 1943 which disabled her from walking normally) the deposition of the mother was taken at Streeter, Stutsman County, in the home of her only son.

The mother died on August 29, 1947, and her son, Henry Klundt, Jr., age 49, was appointed the executor of her will (dated July 1, 1947) and was substituted as plaintiff herein. If the mother had died intestate, she would have been survived by five heirs at law, namely, the son, daughter and three grandchildren. The will devised and bequeathed all of the mother's estate to her son and his wife and three grandchildren, the children of her deceased son, George.

Exhibit 1 is dated December 4, 1944, and purports to convey 160 acres, title to which the mother had acquired in 1942. Exhibit 2 is dated April 22, 1946, and purports to convey 640 acres, of which, the grantor (mother) was the owner of an undivided

one-third interest which, in 1946, was decreed to her from the estate of her first husband. Exhibits 1 and 2 were recorded with the Register of Deeds on September 20, 1946.

Exhibit 3 is dated February 11, 1946, and purports to convey to the daughter, a house and six lots in the village of Medina, which was the grantor's (mother's) home, title to which had previously been vested in her second husband, Peter Hoffman, Sr., subject to a lien of over $2,125 for old age assistance, and which encumbrance exceeded the value of the property. In 1944 the daughter paid $1127.00 for a satisfaction of this lien. In 1946 she paid $126.30 for a tax deed from Stutsman County to the mother.

The trial of this case in the district court was held in January, 1948. On March 18, 1948, judgment was rendered in favor of the defendant, Christina Pfeifle. Plaintiff appealed and on December 7, 1948, the appeal was argued. On March 22, 1949, this court ordered the case remanded for the taking of further evidence. On May 26, 1949, the district court heard further evidence and thereafter made additional findings of fact and conclusions of law, adhering to his former decision in the case. In October, 1949, the remanded record was returned to this court together with the additional record, including new exhibits and typewritten transcript of the additional evidence. Additional briefs were filed by counsel for both parties.

The mother was born in Russia. She had received very little school education there, and did not attend school after arriving in America. Except for a few words of broken English, she spoke, wrote and understood only the German language.

Her first husband, Henry Klundt, Sr. (the father of plaintiff and defendant) died on April 11, 1935, and in the same year, she was appointed administratrix of his estate. In January, 1940, she married Peter Hoffman, age seventy-four, an Old Age Assistance client of Stutsman County. He died on May 31, 1943, and she was appointed administratrix of his estate in November, 1943.

There is a considerable amount of conflicting testimony as to circumstances bearing upon the collateral or evidentiary issues as to whether the mother had previously stated her intentions

of conveying to her daughter, and whether the daughter had advanced her own money in behalf of her mother for which she was entitled to be reimbursed by her mother, and whether the mother had requested the daughter to live with and care for her. These evidentiary issues are not ultimate issues, although they are relevant to the ultimate issue of whether the disputed signatures are genuine.

The daughter testified that in August, 1941, her mother asked her for help in taking care of her and her husband, and as an inducement, she offered to convey all of her property to the daughter in the event that she would give up her home in Streeter and live with the mother in Medina. In her deposition, the mother denied that she requested her daughter to come and live with her, and also denied that she ever agreed to convey her property to her daughter. However, the facts are that not only did the daughter sell her home and other property in Streeter and move to Medina, but, moreover, she took the best of care of her invalid mother for nearly six years, from August 1941 to May 1947. During this time Christina acted as nurse and housekeeper for her mother and, until he died, for Peter Hoffman, who was also helpless. Christina raised chickens, planted and cultivated the garden. She transacted her mother's business affairs. The mother was competent to discuss and understand them but was physically disabled. So the mother merely discussed her business affairs, and signed the numerous business papers as requested by Christina. The mother's personal physician, who was well acquainted with the situation, testified:

"Q. Dr. Stokes, did you have something to do with taking care of her during her lifetime and during her last year?

A. Off and on, all the time in Streeter, but particularly during the last two and a half years of her life, I had more to do with her than ever before.

Q. What was her physical condition?

A. She had a carditis heart. It goes back, probably, as a result of high blood pressure in earlier years. Then when the blood pressure goes down, the heart plays out.

Q. What condition did this leave her in?

A. Helpless. When the heart attacks came and the heart goes bad, she would get dropsy and she couldn't handle herself. She couldn't sleep or anything else. . . .

Q. I ask you to tell the Court whether or not Mrs. Pfeifle took good care of her mother?

A. No one could have done better. The house was clean and spotless, and the bed linen was clean and spotless, and she was always ready to wait on her, day or night, and she did have to wait on her day and night. . . .

The Court: Did she require services similar to those at a hospital?

A. Yes, she was in bed for months at a time. When she had her broken limb, she didn't get out of bed for a couple of years; then she got to struggling around with a crutch and cane, but even then, at the best, she would spend eighteen hours in bed, or lying down when not in bed."

Shortly before the first of May the mother went to her son's home at Streeter for a visit only, returning to Medina about May 5. On May 9, 1947, Dr. Stokes transported the mother from Medina to her son's home at Streeter and there she lived the remaining months of her life. It is not clear why she left, although in her deposition she gave as her reason that Christina was "mean" to her. The proof, however, is to the contrary. She also testified that, about the time she left, she learned for the first time of the existence of the deeds from neighbors who had read in the newspaper of their recording. But the deeds had been recorded during the previous year. Some light is thrown on this strange situation by the testimony of Dr. Stokes:

"Q. Do you remember about the time that Mrs. Klundt left Medina and went to Streeter?

A. I took her down. I wanted her to go to the hospital—I repeatedly wanted her to go to the hospital to save Christina—Christina was worked to death. I don't know whether you people understand what it was for one person to take care of a sick person year after year. A few days is not bad but dragging on

month after month—I wanted Mrs. Klundt to go to the hospital but she would never go. Then when the final blowup came—I don't know what happened—but she thought Christina was not taking care of her but I know darn well that she was because the house was still clean, the bed was clean and that is a good indication. . . .

Q. Are there any other points that you recall that I have not asked you about that are pertinent to your visits to this home out there?

A. I would say that in the last few months of her life that she was *mentally unbalanced,* as lots of these people do get with a failing heart and the blood does not get pumped to the brain fast enough and there is a degeneracy there. On top of that, I think, she had a little stroke about 1945—she was a little stiff in one arm for a while."

As stated above, in 1935, the mother was appointed administratrix of her first husband's estate. In April 1941 she resigned because of ill health and petitioned the county court to appoint her daughter, Christina, as administratrix. So, on June 6, 1941, Christina was appointed administratrix of her father's estate, and continued as such until she had brought the administration of the estate to a close on October 21, 1946. The estate was temporarily insolvent at the time of her appointment in 1941, and, largely due to better crops and prices and the enhanced value of farm land throughout the state, the net value of her father's estate was $10,601.91 at the time of the final decree of distribution on May 29, 1946. The son was indebted to his father's estate in the sum of $883.24 at the time of the final decree, so that he was entitled to only a balance of $197.54 in cash as his share of the personal property, whereas, the daughter received $1080.78. However, the son and daughter each received an undivided two-ninths interest in the 640 acres, of which the mother received an undivided one-third interest under the final decree of distribution.

It is reasonably certain that the daughter paid one-half of the household and living expenses from her own funds but the exact amount paid by the daughter is in dispute. The evidence also is

conflicting as to the amount of the mother's hospital and doctor bills which were paid by the daughter. As we have previously stated, the daughter testified to the effect that in August 1941, she agreed to live with and care for her mother during the remainder of the mother's life, and the mother agreed to convey her property to the daughter; also the daughter testified as to the amounts she had paid out, thus:

"Q. About how much did you pay out, approximately, from the time you went up there in August 1941 until the 9th day of May 1947?

A. Roughly, $7000.00.

Q. You paid that amount of money in the keeping of your mother?

A. And hospital and doctor bills.

Q. And the amount you paid the Welfare Board?

A. Yes.

Q. You still owe one bill, I believe?

A. Yes, I owe one bill to Dr. Stokes.

Q. You still owe Dr. Stokes for taking care of your mother in her last illness?

A. Yes."

The daughter also testified that the only money she ever received back from her mother or through the Klundt Estate or otherwise in repayment of the advances made for the benefit of the mother or the Klundt Estate was $1621.22. However, the plaintiff contends she received more.

The foregoing circumstances bearing upon "the collateral or evidentiary issues" corroborate the daughter's testimony as to why the mother conveyed to her. They also show full performance upon the daughter's part of the obligations she claimed to have assumed in the agreement she said she had made with her mother.

The direct testimony of the daughter and the notary public was that the mother signed the three deeds, each on a different date, in their presence at the mother's home. In contradiction thereto, the mother denied, in her deposition, that she had ever signed any such deeds, but four neighbors testified on behalf of

the defendant that after the alleged deeds had been executed, the mother had told them that she had conveyed everything to her daughter.

The defendant called two non-expert witnesses who testified that they had become acquainted with the mother's signature, and in their opinion, the disputed signatures were genuine. The plaintiff called an expert who expressed a contrary opinion. He expressed the opinion that tremors and pen-lifts (disconnections) appeared in the three disputed signatures and these were not consistent with the genuine specimens, as follows:

"There are certain tremors that are found in the genuine writing which we call tremors of age, and tremors of weakness. Now, tremors of age and tremors of weakness are not readily distinguished from each other, but even the most feeble signatures have a certain abandonment and carelessness shown in all the genuine writing—the writing that is known to be genuine; whereas we have tremors of fraud which is indicated by the very, very, careful joining of the letters and the patching up of letters and that is an indication of the simulation or tracing process.

It would be a physical impossibility for a person, for any person with trembling hand and poor eyesight to have made these penlifts and carefully laying the pen down in the place where it had been again, laying it down as indicated on these enlargements."

However, the notary public explained such discrepancies by testifying as to difficulties the mother had in signing her name, thus: "She had to stop many times before she could finish it because her hands were shaking so and she was in a weakened condition, but her mind was clear and worked perfectly and she knew perfectly well what she was doing all the time and then she signed this and she said, 'Well, I am unable to sign that as nice as I used to sign in German, and it is going to be awful handwriting but I will do the best I can,' and I said, 'That is all that can be expected of you. Nobody expects the impossible of anybody in a sick and weakened condition.' "

The notary public was an experienced business woman who had, since 1918, engaged in real estate and insurance business,

bookkeeping, clerical work and the administration of estates, in addition to the performance of the duties of a notary public. She acted as clerk and bookkeeper for the estate of Henry Klundt, Sr., deceased. She had resided at Medina continuously, since she was a little girl. She was well acquainted with the parties to this action. She reads, writes and speaks the German language fluently. She testified in great detail as to the instructions she had received from the mother with respect to the preparation of the three deeds and as to the preparation and execution of the deeds.

Counsel for the plaintiff contends that the notary public as well as the defendant were impeached as to credibility through the medium of extended cross-examination. The trial court found otherwise, and, suffice it to say, we agree. The question remains, however, as to the value or weight to be given the expert testimony.

The credibility of witnesses, including experts, and the weight to be given their testimony, is for the trier of facts. 58 Am Jur (Witnesses, sec 862) 491; 32 CJS (Evidence, sec 567) 378; Axford v. Gaines, 50 ND 341, 195 NW 555; Shuman v. Ruud, 35 ND 384, 160 NW 507; Jacobson v. Mutual Benefit Health & Accident Assoc., 70 ND 566, 296 NW 545.

The weight to be given to the opinions of a witness testifying as an expert is always a matter to be determined by the trier of facts from all the circumstances appearing in evidence. The trier of facts must reconcile, if possible, any apparent conflict, whether developed upon the whole case or in the testimony of an individual witness, and give effect to all the evidence, when the nature of the case will admit of such a disposition, or if conflict is irreconcilable, must affix his own value to the contradictory evidence. Here the burden of proof is upon the plaintiff to prove that the deeds were not signed by the alleged grantor. Where, as in this case, the deeds are regular on their face and bear a certificate of acknowledgment by a notary public in the form prescribed by RC 1943, 47–1927, such proof must be clear and convincing. Nichols v. Schutte, 75 ND 207, 220, 26 NW2d 515; Cox v. McLean, 66 ND 696, 699, 268 NW 686; Yusko v. Studt, 37 ND 221, 228, 163 NW 1066; Severtson v. Peoples, 28

ND 372, 383, 148 NW 1054; Patnode v. Deschenes, 15 ND 100, 108, 106 NW 573; McCardia v. Billings, 10 ND 373, 379, 87 NW 1008.

The trial judge sitting without a jury found that the grantor had in fact signed each of the three deeds. Upon a trial de novo, under the provisions of RC 1943, 28–2732, the Supreme Court must ascertain the facts from the record before it, but, in making its determination, the findings of the trial court are entitled to appreciable weight. Bryan v. Schatz, ante 9, 39 NW2d 435, 436. After all, a judge, sitting on the trial bench, draws his conclusions not only from the statements of witnesses but from his observations of their demeanor as well. He is in a much better position to judge the weight and credibility to be accorded the witnesses than is an appellate court which has only the cold record before it.

In the light of these principles we have carefully reviewed the entire record and giving to the trial court's decision the weight to which it is entitled we have reached the conclusion that the findings of fact of the trial court are fully sustained by the evidence.

The judgment of the District Court in this case is, therefore, affirmed.

NUESSLE, C. J., and CHRISTIANSON, BURKE and MORRIS, JJ., concur.

GRIMSON, J., did not participate.