[File No. 7346]

ED KNELL, Respondent, v. SAMUEL CHRISTMAN, Defendant and Appellant.

(59 NW2d 293)

Opinion filed May 29, 1953. Rehearing denied July 7, 1953.

*Floyd B. Sperry,* for appellant.
*Thorstein Hyland,* for respondent.

CHRISTIANSON, J.  Plaintiff brought this action against the defendant to recover damages for assault and battery.  He demanded $2000 for compensatory damages and $2000 for punitive damages.  The defendant interposed an answer and counterclaim.  He denied the allegations of the complaint except as admitted, qualified and explained.  He alleged that on or about August 4, 1950, he took up certain horses owned by the plaintiff and then in the defendant's grain fields and causing damage thereto, that defendant was holding said horses in a pasture owned by him and that on August 5, 1950, the plaintiff wrongfully tore down defendant's fences and removed said animals from defendant's possession and that while in the act thereof the defendant approached the said plaintiff "whereupon the said plaintiff undertook to take the defendant down on the ground for the purpose of inflicting bodily injury upon him, the said plaintiff having rushed at the defendant, and having caused the latter to fall to the ground, whereupon the plaintiff held the defendant to the ground, in the course of which, and while the defendant was attempting to free himself, said parties engaged in a fight, during the course of which the plaintiff scratched and bruised the defendant, and that the said defendant only used sufficient force to defend himself against said action of the plaintiff."

The same facts are also alleged in the counterclaim.  In such counterclaim it is also alleged "that immediately after the said plaintiff had destroyed said fences and removed said animals, the defendant approached the scene where the plaintiff had taken down the defendant's fences, for said purpose, whereupon the plaintiff attacked the defendant, by rushing upon him and by taking the defendant down on the ground; that thereafter, the plaintiff proceeded to scratch and bruise the defendant, said defendant thereafter having fought back in his self defense, for the purpose of freeing himself from the plaintiff's hold upon him, and that in the course of said affray, the said plaintiff scratched the defendant upon the face, the plaintiff having also

struck and bruised the defendant upon his body, causing him severe pain, and that after the defendant succeeded in getting away from the plaintiff, the said plaintiff then wrongfully and maliciously caused the defendant to be arrested in an assault and battery proceeding, without any justification, and for the purpose of further annoying, harassing and injuring the defendant; that all of the acts described in this counterclaim arose out of the same affray and took place at the same time, that is described in the plaintiff's complaint, and that as a result thereof, the defendant was caused damages, by the plaintiff, in the sum of $2,500.00." The defendant prayed that plaintiff's action be dismissed and that defendant have judgment against plaintiff for $2500 for actual damages and for $2500 for punitive and exemplary damages. The plaintiff interposed a reply denying all the allegations of the counterclaim. When the case came on for trial in the district court the parties agreed that a trial to a jury be waived and that the case be tried to the court without a jury.

The case was so tried upon the issues framed by the pleadings. The trial court made findings of fact, conclusions of law and order for judgment in favor of the plaintiff. The court found that "the defendant Samuel Christman did willfully and maliciously, beat and strike the plaintiff on the head and body and thereby causing the plaintiff great injury and causing him great pain and suffering and that it became necessary by reason thereof for plaintiff to be treated by a physician and surgeon at a hospital, all to plaintiff's damage in the sum of Four Hundred Eighteen ($418.00) Dollars." The court also found "that defendant has failed to prove the material allegations in his counterclaim." From the facts found the court drew the conclusions of law "that plaintiff is entitled to Four Hundred Eighteen ($418.00) as actual damages and One Hundred ($100.00) Dollars as exemplary damages, making a total judgment of Five Hundred Eighteen ($518.00) Dollars and for the costs and disbursements in the action; and that defendant's counterclaim be dismissed, with prejudice." Judgment was entered accordingly and the defendant has appealed to this court from the judgment and demands a review and retrial of the entire case in this court.

The plaintiff and defendant are neighboring farmers in the vicinity of Hazen in Mercer County. A railroad of the Northern Pacific Railway Company running approximately east and west separates their lands. There are fences along each side of the railroad right-of-way. The defendant Christman testified that he lived on a farm about, but not quite, a mile from Hazen; that the plaintiff lived about a quarter of a mile from him; that both of them lived at such places in August, 1950; that about 1:30 in the afternoon of August 4, 1950, he found two of plaintiff's horses in his (defendant's) wheat field. When asked what he did with the horses he said, "I drove them out and drove them into my pasture" and turned them loose in my pasture. They stayed in the pasture until the following morning and were taken out about 4:30 that morning. That the plaintiff Ed Knell lived "about, not quite, a quarter of a mile from my place." He testified:

"Q. And between the time that you took up the horses and the time that they were taken out, you had no talk with Mr. Knell, did you?
A. No.
Q. And you didn't send him any notice, did you?
A. No.
Q. So the first time when you saw Mr. Knell on the fifth was in the morning, was it?
A. Yes.
Q. And then the horses were on the railroad tracks, weren't they?
A. Yes.
Q. And Mr. Knell was on the railroad track?
A. He was down off the track. He wasn't on the track.
Q. Well, the horses were on the track?
A. The horses was down, too.
Q. Well, it was on the railroad right-of-way?
A. Yes."

He testified that at one time he had paid Knell for damages caused by some of his (defendant's) cattle "that got into his (Knell's) crop," that he settled this by talking with Knell and

there was no lawsuit or anything of that kind. It was settled by talking. The testimony does not show at what time or what year this former incident occurred. He testified that he discovered that the horses were missing from the pasture "about a quarter to five on the 5th of August." That when he got up that morning about 4:30 he could not see the horses but heard the plaintiff calling them, that he walked over to the place where Knell had taken them out, that Mr. Knell was chasing them home along the right-of-way. Defendant testified:

"Q. Did you speak to him first that morning or did he speak to you first?

A. I spoke to him first.

Q. What did you say to him and what did he say to you?

A. Just said, 'Why are you stealing the horses out? Why don't you come and ask for them?' And he said 'I am not stealing them out,' and he came towards me. He threw me on the ground. . . . .

Q. Well, then, just how did he throw you on the ground; that is, how did he grab you?

A. Well, when he came rushing toward me, (I) put my hand up like that to protect my face and he grabbed me around the waist and pushed me down across the track, across the rails.

Q. Then you were over the rails and your back was in between the two rails, was that where it was?

A. Yes.

Q. And he was on top of you?

A. Yes. He come rushing up along the track from the southwest. . . . .

Q. And then you say that he rushed you and through the force with which he struck you, you went down on your back on the railroad track?

A. Yes. . . . .

Q. Where did he have both of his arms when you first went down? As you were going down?

A. Around my waist. . . .

Q. And how did you get out from under him?

A. Well, we just scuffled around and I did have my right

hand free, which I poked him in the ribs then and I managed to hold him off the side then.

Q. Then you rolled him over south of the south rail of the track, is that the way it was?

A. That's right, yes. . . .

Q. And was anything said by Mr. Knell to the boy about helping?

A. Well, Mr. Knell never said anything, but Mrs.—

Q. What did she say?

A. She said to Ervin, 'Go ahead. Go after him.'

Q. What did Ervin do then?

A. Well, he come right toward me then, too.

Q. And what did you do?

A. I just put my hand out and pushed him on the nose and pushed him back, and then I walked through between them and went home. . . .

Q. Well, then after you rolled Mr. Knell over the rail and—

A. Well, he got up again and he hit at me.

Q. Did you try to hold him down after you got out from under him and turned him?

A. No, I didn't.

Q. He got up then and tried to hit you?

A. Yes. . . .

Q. Did you hit him then?

A. I did, yes. . . . Well, he hit at me, that's why I hit him then; after he struck at me. . . .

Q. How many times did you hit him?

A. Well, he come back twice. I hit him twice for sure.

Q. And the first time you struck him after you had gotten up there, you say he went down?

A. Well, he just slipped down the track."

The plaintiff Knell testified that about five o'clock in the morning of August 5th he went to fix his mower and to "set up hay," that he had the mower "over to the railroad tracks right-of-way," that he was over there fixing the mower, that he saw his horses in the defendant's pasture, that there was only

one wire, a telephone wire on the fence, that the barbed wires were down on the ground, that he pulled out the staple on the wire and let his horses out, that they came on the railroad track and were there eating sweet clover when the defendant came over, that when he (Christman) came his son and wife were about 100 feet away "something like that." He said that after "he (Christman) come around like a steamer around the wheat field, they (the horses) beat it over the fence." He testified that when they met the defendant was running and the plaintiff was walking. He said "He (Christman) run up the track. I walked up the track towards the home." When asked what the defendant said to him he answered, "he asked me I stole those horses. Say, 'Did I? What about your calves? How did they get out?' And then he started hitting me." He testified:

"Q. How many times did he hit you?

A. Gosh, I don't know. I went down three times.

Q. Did you fall down?

A. Fall down my knees.

Q. Did he ever notify you that he held your horses for damages?

A. No.

Q. When he hit you, what did you do? Did you fall down?

A. I fall down, yeah.

Q. How many times did he hit you? How many times did he hit you?

A. I really don't know. I—three times sure, I know that much. . . . .

Q. And who struck first, you or him? Did you hit first or did he hit you?

A. He hit me.

Q. And when he hit you, did you fall down or what?

A. Yeah, I went kind of down.

Q. And while you were falling down, did you clinch with him or did you both go down together? When you fell down, did he fall, too?

A. I think kind of. I must have been against him, dropped against him when I fall. . . .

Q. You were walking north and he was walking south?

A. He was southwest there.

Q. And when he hit you, you fell?

A. Yeah.

Q. And when you fell you grabbed him around the feet?

A. That might be; I don't remember. Not on the waist, I know that much."

On cross examination he testified:

"Q. Well, you took the horses out of the fence, did you?

A. Yes.

Q. Was the fence there?

A. One-wire fence there. Some was laying there torn off.

Q. Was there telephone wire?

A. Yes, that was telephone wire. That fence was just about down for two years already."

(The defendant Christman and his wife testified that they had a good three-wire fence; two barb wires and one smooth wire at the place where the horses were taken out.)

Plaintiff testified that they (he and defendant) were not on the railroad track and that the defendant could not have been down on his back between the rails because they "were not up on the track yet." He also testified he was not on top of him "but maybe on the side." He testified that when he got up the first time the defendant came from the back and hit him on the top of the head, that when he was knocked down the last time they (his wife and son) helped him up, that after defendant hit him he ran after his son.

"Q. And where did you go from the railroad track?

A. Home.

Q. Went home. And was your wife home then?

A. She went along with me.

Q. And what did you do when you got home?

A. Washed up and patched up a little. . . .

Q. And then what did you do after that?

A. I went down to the doctor in the hospital there.

Q. Doctor Anders?

A. Yeah."

Dr. Anders testified that he examined the plaintiff Knell and treated him for a scalp laceration. He testified:

"Q. And what kind of treatment did you administer to him?

A. The man was treated by cleansing the scalp, examination to satisfy myself that there was no skull fracture, suturing the laceration and the man was discharged for dressing."

Dr. Anders said he took four stitches in the laceration and that he removed the stitches approximately a week later. He testified further:

"Q. In your examination of the wound on his head there, would you say that it was caused by a hard object?

A. I would. . . .

Q. How many of these lacerations did he have?

A. He had one major laceration, which I repaired, and along the edge of it were minor lacerations which did not require suturing. More abrasions than true lacerations.

Q. And by abrasions you mean minor breaks in the skin at some point, do you not?

A. Breaks in the skin approximately less than inch deep.

Q. Where was the major laceration?

A. Across the area of the skull, approximately centered. . . .

Q. Did you determine through those means whether or not this man was in pain at the time?

A. He did, at the time, appear to be in sufficient pain to require checking of those factors.

Q. Then you would say that he wasn't suffering a great deal of pain at the time?

A. The pain associated with laceration would be the extent of the pain that I was able to judge."

Mrs. Knell testified that her husband left home about 5 o'clock in the morning on August 5th, that she and their son Ervin followed a short time after, that they went down to the railroad track, that she saw the defendant Christman there, that she saw the fight there between Sam Christman and her husband, that Christman started it by striking and knocking her husband down, that he hit him about three times, that her husband went down the first time "right away he (Christman) knocked him

down," that the horses went home and into their pasture. That when her husband got up "he (Christman) knocked him down again; hardly can get up," that he was down three times, that when the fight ended he could hardly see, "his face was all full of blood." She testified that the defendant ran after her son "who was fifteen years old and hit him pretty hard." That after the fight she took the plaintiff to their house and washed his sores, that after he had been cleaned up plaintiff went to see Dr. Anders at Hazen. She testified:

"Q. Did you tell your son to get into this fight and help his father?

A. Yes. I says, 'Ervin, go and help daddy. He going to kill him,' I said.

Q. Your husband had Sammy down on the railroad track there at one time, didn't he?

A. No, he hasn't. He got no chance to.

Q. Your husband was on top of Sammy, wasn't he?

A. No, he wasn't. He got no chance.

Q. You claim that he wasn't on top of Sammy when they were fighting on the railroad track?

A. No, he wasn't. How can he? He was knocked down. He was knocked down right away.

Q. Were you there when the fight started then?

A. Yes."

She testified that the defendant had a hammer in his hand. (The defendant denied that he had a hammer.)

"Q. Now, as I understand it, you claim that Sammy struck your husband and knocked him down and your husband got up and then Sammy hit him again, is that right?

A. That's right.

Q. And you claim that they weren't fighting on the ground at all at any time?

A. Well, he try to get up, you know, but he can't. He knocked him down. The face was all full of blood. He can't see out of his eyes."

Ervin Knell testified that he is the son of the plaintiff and that in August, 1950, he was fifteen years of age; that on the

morning of August 5th about 5 o'clock his mother told him that his father was chasing the horses and that he and she went over there; that when he got near the place he noticed the defendant Christman coming. When he first saw him he was walking across the corner of the plaintiff's wheat field and then cut across the pasture and went in the direction of his father, that he (defendant) was approximately seventy-five feet from his father and that Christman was approximately 150 feet away from Ervin Knell; that he saw the plaintiff and defendant when they met and was only a short distance away from them. He testified:

"Q. Would you tell us what happened when they met?

A. Well, they just—I mean, they come close together, about four feet apart, and then Sam told my dad, he says, 'Why did you steal the horses out?'

And then dad says, 'Did I?' And then he says, my dad says, 'Well, how about those calves?'

And then Sam hit him.

Q. What did your father do, if anything, that you could see at the time?

A. He went down. I—as soon as he hit him, then he went down. . . .

Q. And when he got up, what happened?

A. Then he hit him again.

Q. Who hit him?

A. Sam Christman.

Q. Sam Christman here?

A. Yeah.

Q. What happened to your dad? Did he go down again?

A. Well, he went down again, yes.

Q. How many times did you see him hit him?

A. I couldn't say for sure. . . .

Q. Did you hear Sam Christman say anything at that time?

A. Yes.

Q. What, if anything, did he say?

A. Before or after the fight?

Q. Before or after. .

A. Which one?

Q. Both.

A. Before. He said, well, he says, 'How come you stole the horses?' And then after the fight he told him, he said, 'Well, next time it's going to be worse.'

Q. Sam Christman said that to your dad?

A. Yes.

Q. Did you hear that, did you?

A. Yes."

(The defendant Christman denied that he made the statement, "Well, next time it's going to be worse.")

He testified that after the fight he went over and "helped his father up" and that he and his mother helped him to go home; that he was bleeding and after his sores had been washed he went to see a doctor. He testified that when he first saw the defendant Christman he was about 150 feet away and that "then he (Christman) started running and I just kept on walking slow, and I was about twenty-five feet away from both and they was close together, . . . Q. And how far were you away from the place where they were talking at that time? A. About twenty-five feet." He testified that they were not scuffling at the time the first blow was struck, that Christman was still standing, that they were out on the south side of the railroad track but that after the second blow they were both on their sides and that nobody was on top, that when they did get up Christman again hit his father, that his father did not even get all the way up, "he wasn't even standing" when Christman struck him again, that his father did not get all the way up when he was struck and knocked down again. He said that the defendant then "went after me and hit me." He testified:

"Q. How did he strike you?

A. With his fist.

Q. Where did he hit you?

A. My arm.

Q. Well, isn't it a fact that he just pushed you away?

A. I can't get no black and blue arm from a pushing.

Q. And it's because you got a black and blue arm that you say he struck you with his fist, is that right?

A. Yes. Well, then I felt it, too."

There is no evidence to show that the defendant used any instrument in striking the plaintiff, although the doctor testified that he would say that the wound was caused by a hard object. The fact remains that the plaintiff did sustain severe lacerations. In the counterclaim it was alleged that the plaintiff after "taking the defendant down on the ground proceeded to scratch and bruise the defendant" and "that in the course of said affray the plaintiff scratched the defendant upon the face, the plaintiff having also struck and bruised the defendant upon his body." Defendant's wife and father testified as witnesses upon the trial. The wife testified her husband complained about his neck, backache and wrist. She did not testify that she saw any scratches or bruises on his face or on his arms or back or at all. The defendant's father testified that on the morning of August 5th his son (the defendant) called him on the telephone and told him about the trouble between him and the plaintiff Knell and asked him to come to defendant's home and that in response to this telephone call he went there, that when he arrived it was between 7 or 8 o'clock in the morning, and the defendant and his wife were sitting at the table eating breakfast, that the defendant did not seem to eat and that tears were running down his face, that he looked "shook up" and had his hand down, that he thought it was his right hand that was down and that he asked the defendant what was the matter and that the defendant showed him his hand and told him what was the matter. (The defendant elsewhere testified that he struck the plaintiff with his right hand.) There is no further description of the appearance of the hand and there was no claim or testimony that he observed any scratches or lacerations on his face or on his wrist or arm or any other part of his body.

On this appeal the defendant demanded a trial anew of the entire case in this Court. The rule is well established that on such appeal the judgment of the trial court upon the facts must "have weight and influence with this Court, especially

when based upon the testimony of witnesses who appeared in person before that court." Christianson et al. v. Warehouse Association, 5 ND 438, 67 NW 300; Bingenheimer Mercantile Co. v. Sack, 50 ND 381, 385, 195 NW 969, 970; Doyle v. Doyle, 52 ND 380, 389, 202 NW 860, 863; Coykendall v. Briggs et al, 60 ND 267, 270, 234 NW 74, 75; Horner v. Horner, 66 ND 619, 620, 268 NW 428; Donovan v. Johnson, 67 ND 450, 455, 274 NW 124, 125; Buchanan v. Buchanan, 69 ND 208, 285 NW 75; Funk v. Baird, 72 ND 298, 309, 6 NW2d 569, 575; Klundt v. Pfeifle, 77 ND 132, 41 NW2d 416.

In this case the parties and their witnesses appeared in person and testified. The trial court had an opportunity to hear the testimony as it fell from their lips and to observe their demeanor and the various incidents of the trial which are not shown by the cold and lifeless record. "The trial court had the advantage of all of these things and, breathing the air of the trial, he was in an immeasureably better position to find the real facts in the case. Therefore, notwithstanding that the case is here for trial de novo, we must give some appreciable weight to the determination of the trial court." Doyle v. Doyle, 52 ND 380, 389, 202 NW 860, 863.

In Buchanan v. Buchanan, supra, this Court said:

"The testimony of the parties is in direct conflict. , . . The means by which an appellate court may measure the credibility of witnesses are exceedingly limited. There are, however, many indicia of truth and falsity, of exaggeration and of recklessness in testimony, which enter into the atmosphere of a trial of this character and which can not be preserved for the benefit of a reviewing court. Of these, the trial judge had the benefit. His decision is entitled to appreciable weight." 69 ND at pp 209–210.

After due consideration the trial judge announced his decision in a memorandum opinion. In such opinion he referred to and briefly summarized the evidence. Thereafter he said:

"While the testimony of the respective parties is in direct conflict, that of the plaintiff is corroborated by his wife and son. Then, too, there is the fact that ill feeling had existed between the parties for some time; that the defendant went to the plaintiff while upon his own premises immediately after the

horses were released but while in plaintiff's possession. Defendant said that he wasn't mad, but his opening remark, charging plaintiff with theft of the horses, would indicate otherwise. He is a young man, twenty-four, weighs 162 pounds and agile. The plaintiff is fifty-two, weighs 200 and slow in action.

"When defendant went to plaintiff he did not demand a return of the horses, but went for the evident purpose of picking a fight. Their relations in the past had been unfriendly and the alleged wrongful act of plaintiff in releasing the horses did not improve his feelings. He had no olive branch to present. Defendant had no right to take the law into his own hands and mete out punishment, notwithstanding the plaintiff may not have been within his legal rights in releasing his horses."

He concluded that the plaintiff was entitled to recover $400 for personal injuries, $18 for hospital and doctor bills, and $100 for punitive damages and a dismissal of plaintiff's counterclaim with prejudice. Thereafter findings of fact and conclusions of law in conformity with the views expressed in the memorandum opinion were duly signed by the judge and filed with the clerk of the district court and judgment entered accordingly.

The findings of fact of the trial court and the views expressed in his memorandum opinion are well sustained by the evidence. A majority of the Court, however, are of the view that the conclusions of law should be modified so that punitive damages are not allowed. Accordingly the judgment appealed from will be modified by eliminating the award of $100 for punitive damages and as so modified the judgment is affirmed.

Morris, C. J., and Sathre, J., concur.

Burke, J. (dissenting). Plaintiff and defendant are neighboring farmers. Defendant's farm buildings are about one-half mile southeast of plaintiff's buildings. A railroad right of way which runs approximately east and west separates their lands. The undisputed testimony discloses that plaintiff went to defendant's premises, at approximately five o'clock on an August morning for the purpose of releasing some of his horses which

defendant had impounded because of damage the horses had done to his wheat crop. To accomplish the release plaintiff proceeded along the railroad right of way to the pasture in which the horses had been placed. According to his own testimony, he extracted a staple by which the top wire of the fence, enclosing the pasture, was affixed to a fence post, let the wire down and called his horses out through the gap he had thus made in the fence. He had already started to drive his horses home along the railroad right of way, when defendant came through the gap in the fence. Plaintiff testified, "He (defendant) said I stole that horses. And I told him, 'Did I?' I say, 'What about your calves? How did they get in and out of my fence?' And he started coming after me." Plaintiff also testified that as defendant came toward him he went toward the defendant. There is a direct conflict in the testimony as to what happened when the two met. Plaintiff said that defendant hit him and as he fell forward he grabbed the defendant around the legs and they both fell to the ground. Defendant says that plaintiff grabbed him around the waist, threw him to the ground and fell on top of him and that no blows were struck until they were both on their feet again. In my opinion it is immaterial which version of the beginning of the fight is accepted as true. It is evident from the record that bad blood had existed between the parties for some time. On two occasions plaintiff had impounded livestock of the defendant. On one of these, defendant had paid fifty dollars damages to secure their release. On the other, they either escaped or were released without the knowledge of plaintiff. On this occasion when defendant appeared and charged plaintiff with stealing the horses, plaintiff countered by charging the defendant with stealing the calves. At that time the plaintiff was between the defendant and plaintiff's home. For him to go towards the defendant, as he stated he did, it was necessary for him to turn around and move in a direction away from his home. No conclusion other than that the gauntlet was thrown and readily accepted seems reasonable to me in the circumstances. It was a mutual combat.

Each person injured in a mutual combat may recover from the other all damages for injuries received. McCulloch v. Goodrich,

105 Kan 1, 181 P 556, 6 ALR 386; Teeters v. Frost, 145 Okl 273, 292 P 356, 71 ALR 179; Colby v. McClendon, 85 Okl 293, 206 P 207, 30 ALR 196.

In this case, the defendant counterclaimed for damages for injuries received by him in the fight. In his memorandum opinion the trial judge stated his conclusion that defendant had received injuries but dismissed the counterclaim on the ground that the responsibility for the fight rested upon the defendant alone. In this I believe the trial court was in error. If the defendant was injured, as the trial court found, he was entitled to have his damages assessed and allowed. For this reason I believe a new trial should be granted.

GRIMSON, J., concurs.