No. 39,557

Marvin Shumate, *Appellee*, v. Vet's Cab, Inc., *Appellant*.

(281 P. 2d 1071)

Opinion filed April 9, 1955.

*Arthur G. Johnson,* of Wichita, argued the cause, and *K. W. Pringle, Sr., Dwight S. Wallace* and *Daniel C. Bachmann,* all of Wichita, were with him on the briefs for the appellant.

*C. H. Morris,* of Wichita, argued the cause, and *Robert F. Bailey* and *Forest V. McCalley,* both of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Plaintiff brought this action in the district court of Sedgwick County to recover damages for personal injuries sustained by him in a fight with William Anderson, whom he named as defendant, which fight occurred in the breakfast nook of the dining room of plaintiff's landlady. He joined as defendant the Vet's Cab, Inc., hereinafter called the Cab Company, as being jointly liable with Anderson. A jury trial resulted in judgment for plaintiff against both defendants for $7,500. The Cab Company alone has appealed.

The facts disclosed by the record may be summarized as follows: Plaintiff, a single man 35 years of age and employed by the Kansas Gas and Electric Company in its maintenance department, was living at 2412 East First Street where he roomed and boarded with Mrs. Larkin, his landlady. About 8:00 o'clock on the morning of January 1, 1953, he called the Cab Company for a cab to go visit his friend, a Mr. Campbell who lived at 2042 North Market. Anderson, who was the cab driver, responded to the call. Plaintiff appeared and asked Anderson to wait a few minutes for his landlady who was going with him. He remarked that he wanted to visit a friend and take him a drink of whiskey, Anderson said it was New Year's Morning and he wouldn't mind having a drink himself, "so I gave him one." Plaintiff had the whiskey with him, Anderson had no whiskey. Anderson drove the cab to the Campbell home.

By that time plaintiff decided he needed additional whiskey and asked Anderson if he could get it. Anderson said he could get it after the liquor store opened at 9:00 o'clock; plaintiff told him to get a pint. Plaintiff and Mrs. Larkin paid Anderson for the trip to the Campbell home, and Anderson drove away. Soon after 9:00 o'clock he returned to the Campbell home, knocked on the door, Mrs. Campbell let him in, he had a pint of whiskey with him, and plaintiff paid him for the whiskey and 35¢ for his trip to get it. Anderson sat down there with them and he, Campbell, the plaintiff, and Mrs. Larkin drank whiskey and visited until about 12:00 o'clock. During that time they had consumed all of the whiskey plaintiff had, including what was in the bottle at the time they started the trip—Mrs. Campbell did not drink. At that time they were ready to go back to Mrs. Larkin's place. Mrs. Larkin was asked, "Did Mr. Anderson drive all right when he was driving back home?" She answered, "Perfectly. As I say, you would never know he had anything to drink. . . ." On the way back to the Larkin home on East First Street they stopped at a liquor store and plaintiff purchased a "fifth" of whiskey. When they got to Mrs. Larkin's rooming house on East First Street Mrs. Larkin got out, she paid a part of the taxi fare and plaintiff paid the remainder, $1.15. Plaintiff told Anderson to drive his cab around back of the house and park it in the alley. Anderson went in the house from the alley accompanied by plaintiff who invited him to have a drink. They went into the kitchen and sat down at the table in the breakfast nook and soon got into a fight. We shall not recite the details of the fight since the plaintiff and Anderson gave different versions of it, except to say that if Anderson's testimony is correct plaintiff was the aggressor. Plaintiff, on cross-examination by the attorney for the Cab Company, testified that he was not hurt while getting into the taxicab, nor in riding in the taxicab, nor in getting out of the taxicab. He was asked and answered the following question:

"Q. And isn't it true all the injuries and damage you complain of, occurred in the private residence away from the taxicab? A. That is right."

The record further disclosed that the Cab Company's arrangement with each driver was that the driver was an individual operator in business for himself. The Cab Company provided, for a certain fee, a radio, switchboard service, and liability insurance to protect persons against accidents and injuries while they were in the cab.

When the matter of insurance was mentioned the question was

raised as to whether the Cab Company had insurance that protected the passenger in a fight with the driver away from the cab. The court suggested they get a better understanding with respect to that matter. The city ordinances were examined and there was an exchange of ideas. The insurance policies were left with the court for examination. The next day the court instructed the jury that the insurance policies were standard automobile liability policies and did not cover the damages and injuries sued for in this case. The jury was instructed to disregard the entire element.

The fee the driver pays to the Cab Company is a certain amount for every shift. It is a set fee without regard to what the driver makes. The driver makes no accounting to the Cab Company for his fares. The cab driver must first get a chauffeur's license from the state and then get a driver's license or permit to drive the cab from the police department. An officer of the police department checks each applicant for the City's License as to his eligibility and gives him an examination on traffic rules and regulations, an eye test, makes inquiry of him concerning his past record, and if he passes all the tests and his record is satisfactory they issue to him a temporary permit to drive a taxi. After 21 days they check the driver's record to see how he is getting along and if he is doing well they issue to him a City Taxicab Driver's License. The officer testified that this was done with Anderson and the temporary permit was issued to him on September 15, 1952. In getting information from him they take his fingerprints and submit them to the F. B. I. On October 6, 1952, they received the F. B. I. report which disclosed his previous criminal record; that in 1940 and '41 he had been arrested for vagrancy and some other misdemeanors in California; that in 1948 he had served time in the Missouri penitentiary upon a conviction or plea of guilty of felonious assault. It was the practice of the police department of Wichita that if a man's criminal record was as much as 3 or 4 years old and nothing against him in the meantime they would give him a permit to drive a cab and see if he could rehabilitate himself. This criminal record was never reported to the Cab Company. The manager of the Cab Company relied upon the investigation and report made of the applicant. In the trial of this case plaintiff introduced this F. B. I. record and the court admitted it over the objection of the Cab Company. There was no adverse record of Anderson in Wichita. He was married in Wichita about two years before the trial. His wife was a typist at

the Beech Aircraft Company and also a qualified teacher and planned to teach in the city schools the coming year. She testified that since she had known him he had never been engaged in a quarrel or fight with anyone other than the one in question. There was no evidence to the contrary.

In the petition plaintiff alleged that Anderson had the reputation of being a belligerent, quarrelsome, bullying type of individual and consistently engaged in the use of abusive language and physical abuse; and, that this was known to the Cab Company. There was no evidence to support that claim other than the F. B. I. report. The petition further alleged:

"That the defendant William Anderson is a resident of Sedgwick County, Kansas, and his post office address is . . . Wichita, Kansas. That on the 1st day of January, 1953, he was an employee, agent and servant of the defendant Vet's Cab, Inc., and in all matters and things that he did do, say, act and perform. . . ."

The Cab Company specifically denied this allegation of plaintiff in its verified answer. The reply to that answer was an unverified general denial.

Counsel for appellee in their brief say: "In Mutual Combat Each May Recover from the Other for All Injuries Received from the Other in the Fight." citing *McCulloch v. Goodrich,* 105 Kan. 1, 181 Pac. 556. The point is not important here. The evidence shows no agreement to fight such as was in *McNeil v. Mullin,* 70 Kan. 634, 79 Pac. 168, or *Teeters v. Frost,* 145 Okla. 273, 292 Pac. 356. See, also, 6 C. J. S., p. 806. In *Taylor v. Commonwealth,* 281 Ky. 442, 136 S. W. 2d 544, it was held: "A 'mutual affray' or 'combat' justifying a qualifying instruction on self-defense is a fight in which both parties willingly enter and is similar to a duel." (¶ 2.) See, also, definition of "Mutual Combat" in Words and Phrases, Permanent Edition.

The time the fight between Anderson and plaintiff occurred is not definitely stated. Mrs. Larkin testified that it was soon after the men sat down at the table. She also testified soon after the fight she called the taxicab company and reported there had been trouble at her place, giving the address, which she didn't want to discuss over the telephone. Mr. Harris of the Cab Company went to her home immediately and talked with her. He testified that Anderson's cab was still in the alley; that he couldn't take it away then because he was alone; that he went back to the cab office and called a man to go with him and returned to Mrs. Larkin's place,

and at that time the cab had gone. He fixed the time he was called between 3:00 and 4:00 o'clock in the afternoon. As far as the appellant Cab Company is concerned the exact time the fight occurred is not important. Neither is it important whether it was a mutual combat. The thing that is important is that it was after Anderson had brought plaintiff and Mrs. Larkin to her home.

In this court counsel for appellant cite cases on the relation of principal and agent, which, under the facts in this case, would tend to prove no liability of the Cab Company. In this court counsel for appellee say:

"Defendant Cab Company is Liable for Driver Anderson's Wrongs not as a Master but as a Common Carrier With a Duty to Protect Its Passengers from Assault or Wrongful Conduct of the Servant.

"Appellant in their brief rely upon the Master and Servant cases involving tortious acts of servant in noncommon carrier cases. Their argument and authorities are not in point and are not to be relied upon."

Having abandoned the thought of liability of the Cab Company upon the law relating to master and servant, appellee contends the Cab Company is liable under the doctrine applying to carriers of passengers, citing the case of *Korner v. Cosgrove* (1923), 108 Ohio St. 484, 141 N. E. 267, 31 A. L. R. 1193. This doctrine is not new. There are at least five annotations on the subject in A. L. R: 4 A. L. R. 1499; 31 A. L. R. 1202; 45 A. L. R. 297; 69 A. L. R. 980; and, 96 A. L. R. 727. Many cases are cited under each annotation. None of them would give comfort to the appellee. The relation between a common carrier of persons and the passengers originated in contract. For railroads a passenger buys a ticket in advance but with taxies the passenger calls or hails the taxi and when it appears gets in the taxi and advises the driver where he wants to go and pays at the end of the journey. Both the railroad and the taxi company agree to convey the passenger to his destination, to treat him courteously, and to permit no harm to come to him by any employee of the railroad company or the taxi company or from other persons, so far as practicable, and to deliver him safely to his destination. When he is delivered safely and permitted to get out of the railroad car or taxi the contract is finished. In this case, according to the testimony of plaintiff and his landlady, the contract by which the Cab Company and Anderson undertook to transport plaintiff and his landlady from the Campbell home to Mrs. Larkin's rooming house was completed with safety. Anderson handled his car "perfectly." Plaintiff was not hurt while he was getting in the taxi or

being conveyed in the taxi, nor in getting out of the taxi, and the taxi fare was paid at the end of the journey. The only injury plaintiff received was in the Larkin rooming house at some time, perhaps not very long, perhaps as late as two hours or more, after the contract of carriage of them had been completed. We find no case cited in the annotations above mentioned or elsewhere that permits recovery under those circumstances.

At the close of plaintiff's evidence the defendant Cab Company filed a demurrer thereto on the grounds that the evidence was not sufficient to establish any liability against it. This demurrer was overruled. We think it should have been sustained for it is clear from the evidence that the contract of transportation of plaintiff and Mrs. Larkin from the Campbell home to Mrs. Larkin's rooming house had been fully completed sometime prior to the fight between Anderson and the plaintiff. In view of this conclusion it is not necessary to treat other questions raised by the appellant. From this it follows that the judgment of the trial court should be reversed with directions to sustain the demurrer of the Cab Company to the evidence, and render judgment in its favor. It is so ordered.