C. T. HUGHES CONSTRUCTION COMPANY and Tri-State Insurance Company, Petitioners,

v.

Willie L. PHILLIPS and the State Industrial Court, Respondents.

No. 41031.

Supreme Court of Oklahoma.

April 20, 1965.

Robert E. Shelton, Philip L. Savage, of Savage, Gibson, Benefield & Shelton, Oklahoma City, for petitioners.

Don Manners, and Charles R. Nesbitt, Atty. Gen., Oklahoma City, for respondents.

BLACKBIRD, Justice.

This is an original proceeding by C. T. Hughes Construction Company, employer, and its insurance carrier, Tri-State Insurance Company, to review an award made to Willie L. Phillips, claimant, by the State Industrial Court under the death benefit provisions of the Workmen's Compensation Act.

On August 27, 1963, claimant filed her claim as the surviving widow and sole dependent heir of Virgil Floyd Phillips, deceased. She alleged that on August 12, 1963, deceased sustained an accidental injury arising out of and in the course of his employment with the above employer which resulted in his death on the same day. She filed an amended claim on November 21, 1963, which did not materially change the allegations. Petitioners here, respondents below, filed their answer denying that deceased died as a result of "any alleged injury, but died as a result of other causes."

On January 22, 1964, a hearing was had before a trial judge of the lower court. At that time it was stipulated by the parties that deceased was employed by employer on August 12, 1963, and that he was covered by a workmen's compensation insurance policy; that deceased became sick on the job and was dead on arrival at the hospital.

Claimant testified that deceased was 58 years of age at the time of his demise; that he had worked for employer 8 years; that he had never been off work during that time because of illness; that he had only been to a doctor one time and that was for an "allergy in the throat;" that deceased was a "mortar man" for employer.

Claimant introduced into evidence, without objection by petitioners, the deposition of Homer Chadwick, which was taken on January 8, 1964. Chadwick testified that he was the "masonry foreman" for employer; that deceased worked "under" him as a mortar man; that on August 12, 1963, he and deceased were working at the General Motors Building in Oklahoma City; that deceased went to work that morning at approximately 7:30 A.M., to prepare the mortar for the brick layers who went to work at 8:00 A.M.; that on that job he didn't know whether the mortar was mixed by deceased by machine or by hand; that they finished that job at about 10:30 A.M., and went to employer's office in another part of town where they were to do some "make-up work" raising a wall; that witness was working on a scaffold that was approximately 8 feet high and that the scaffold was inside the partially completed building. (It had been previously stipulated that there was no roof on the building on the above date.) Witness testified further that they began work on this job at about 11:00 A.M.; that deceased made the mortar for this project by hand in a wheelbarrow; that in making the mortar, deceased would put sand in the wheelbarrow with a shovel, the cement in with the sand either by shovel or by picking up a sack and pouring it into the wheelbarrow and along with water, mix the sand and cement together by chopping it with a hoe; that a sack of cement weighs 50 pounds and that he was sure deceased

carried some of the 50 pound sacks because witness was using "masonry cement"; that after the mortar was mixed, deceased would put it into a five gallon bucket with a shovel, then raise the bucket of mortar by rope and pulley up to witness on the 8 foot scaffold; that a shovel of the mortar weighed "maybe 15 or 20 pounds" and that usually two and one-half to three shovels of mortar were put into the bucket; that deceased had pulled up 12 to 14 buckets of mortar to the scaffold when he asked witness "if it would be all right if this other boy mixed the mortar" and that was the first indication he had that deceased was sick. Witness testified that prior to deceased making this request to be relieved from mortar mixing, there had been some blocks or bricks transported to the scaffold. An excerpt from his testimony is as follows:

"Q. Allright, when did this take place?

"A. Oh,—I would say 1:30 we had gone back to work.

"Q. Now, was there any blocks or bricks or anything transported to this scaffold, I believe you mentioned previously about a truck backing up there?

"A. Well, I'm sure there was.

"Q. And who would place the blocks up there?

"A. Well, Mr. Phillips or this other boy—

"Q. What would these blocks weigh?

"A. I imagine they would weigh around 30 or 35 pounds.

"Q. And how—about how many of them were there?

"A. I imagine—I wouldn't, or couldn't be definite, but I imagine there was maybe a 100 or 150 there in the walls up there."

The witness also testified that "it was about 103 or 104 that day, it was a hot day"; that deceased was "wheelbarrowing" sand from one sand pile to the location where he mixed it with the cement and that the loca-

tion was in the sun; that when he relieved deceased from his duties at his request deceased went into a little room which also had no roof on it and "kind of enclosed" but didn't stay there long, came out of the room and went to the back of the building where there was some shade; that he talked to deceased a few minutes and went back to work; that shortly thereafter he looked around and deceased had passed out, down "on his stomach"; that deceased regained consciousness and started walking around and went unconscious again; that deceased again regained consciousness, leaned against a wall, smoked a cigarette and "talked to us" and then died; that prior to his death, deceased said to him " 'Homer, before we see the doctor, I feel sick at my stomach and I'm going to the bathroom.' "

"Q. Was that the only time he complained of pains in his stomach or pains —chest pains?

"A. Yes."

On cross-examination, Chadwick testified that the usual way to mix mortar was with a mechanical cement mixer; that normally deceased did not have to mix mortar with a hoe but would use a mixer; that on the job where deceased became ill "I had no mixer there so we had to do the next best thing."; that on the General Motors job, which took four months to finish and was the project which was completed in the early morning of deceased's death, deceased did not mix mortar in a wheelbarrow but used a mixing machine.

Claimant introduced into evidence a medical opinion by Dr. R which was predicated upon the following hypothetical question:

" 'Assume a white male, age 58, working on August 12, 1963, working for the C. T. Hughes Construction Company, who was of small build, and who had been employed as a mortarman for eight or more years, and had not missed any time from work due to illness; and who had successfully performed his work for employer; and who had a negative medical history for any illness other than one medical

treatment for an allergy during the past eight years; and who on the day of his death went to work at 7:30 or 8:00 A.M., and who died at approximately 2:00 or 2:30 P.M., and in the period of time before his death and after commencing work, had made mortar to set some tiles inside the General Motors building; and at approximately 11:00 A.M. commenced mixing mortar in a wheelbarrow, with a hoe, inside a concrete building, that had no roof, working with sand that had to be shoveled into a wheelbarrow and pushed across the street, and mixed with mortar mix, containing lime, which had to be handled in 50 pounds sacks; and further assume that the day was 100 to 104 degrees; and further that the man was working in the sun; and further assume that in the mixing of this wheelbarrow of sand and mortar mix, that it was necessary to use a chopping motion, and to add water to the mix; and further assume that the mortar when finished and shoveled into a 5 gallon bucket, and raised by means of pulling a rope, which necessitated raising the hands and arms above the head, and pulling down on the rope; and further assume the mortar had to be raised by means of pulling a rope, which necessitated raising the hands and arms above the head, and pulling down on the rope; and further assume the mortar had to be raised to a scaffold approximately 8 feet high, and further that he had raised 12 or 14 bucket loads up to the scaffold; and further assume, doctor, that this hypothetical man, had taken 30 minutes for lunch, and at approximately 1:30 P.M. had unloaded, by hand, with the assistance of another worker, 100 to 150 concrete blocks weighing from 30 to 35 pounds each, from a truck bed approximately 4 feet high, up to a 8 foot scaffold, or a distance of 4 feet lift for each block; and further assume that generally this hypothetical man used a cement mixer for the mixing of mortar,

and that on the previous job lasting 4 months, a cement mixer was used at all times; and doctor, further assume that the man complained of being sick to his stomach immediately prior to his death; and assume doctor, that after he had first complained of illness of any kind during that day that he was, after resting, and when apparently returning to work, observed to fall, and was apparently unconscious; and further assume that after such episodes of unconsciousness that he had been able to walk and talk; and that he was pronounced dead soon after arrival at the hospital; and further assume that the death certificate gives as a cause of death, 'Likely Acute Coronary Occlusion'; and further assume that this man did not normally mix mortar in a wheelbarrow, would you have an opinion as to the cause of death, and further would you have an opinion as to any contributing factors to the cause of death?' "

In response thereto, Dr. R stated:

"The summary of this man's activities on the day of his death as given in the above hypothetical question would indicate that although his normal work would be expected to be reasonably strenuous, that he had been called upon to perform several tasks on the day of his death that were excessive and unusual. This would be particularly true in view of the ambient temperature above 100 degrees. Hand mixing of mortar is from my personal knowledge and experience a task which causes repeated increases in the intrathoracic pressure. Each 'hacking motion' with the hoe is accomplished ordinarily with the glottis closed in order to fix the chest wall as the origin of the muscular activity which utilizes muscles arising from the chest wall. Among these muscles are the latissimus dorsi which are used in pulling the arms forcibly against the chest in the typical motion used in hand mixing mortar. In a

hand mixing job one frequently hears involuntary 'grunts' as the hoe slices into the mortar as evidence of the force used which forces air contained in the chest out through this completely or partially closed glottis by the sudden increase in pressure. In like manner there is an expected increase in pressure due to the lifting and carrying operations performed by this man in the hypothetical situation. It is also probable that the amount of energy expended in the exertion of this day was more than would have been expected of him on an ordinary day. The increased metabolic activity of the increased ambient temperature coupled with the increased exertion, and further complicated and aggravated by repeated and rapidly repititious increases in intrathoracic pressure would all be expected to produce excessive and unusual strain on the heart and vascular system.

\* \* \* \* \* \*

"The combination of all of the above circumstances, conditions, and factors which within themselves might be expected to produce a coronary occlusion when coupled with such activity on an excessively hot day did in my opinion, and well within the realm of reasonable medical probability, produce a coronary occlusion resulting in a myocardial infarction, which subsequently produced death in the hypothetical individual above described."

Petitioners introduced into evidence a United States Weather Bureau report which stated that on the day in question at 2:00 P.M. the temperature at Will Rogers Airport was 100 degrees F. and three pictures showing the general location and outlay of the project where deceased was working at the time he became ill.

The record further reveals that at the end of the hearing before the trial judge, and after all the above evidence had been introduced by both parties, the following transpired:

"MR. MANNERS (Attorney for claimant): Thank you. At this time the claimant rests its case with the submission of the deposition (of Homer Chadwick) and the testimony of the widow. However, we would like leave of the court, if Mr. Shelton should offer the medical of two doctors, to have leave to submit a hypothetical question, the same one, to another doctor. It has been submitted to another doctor. His report was not available.

"MR. SHELTON (Attorney for petitioners): Let the record show, if the court please, that we have leave to submit medical testimony by deposition, before we rest our case?

"THE COURT: That is ordered.

"MR. SHELTON: We will try to do that as quick as we can.

"MR. MANNERS: Under the circumstances the claimant rests.

"THE COURT: Very well."

On February 27, 1964, petitioners took the deposition of one Bobby Ray Wright, a co-employee of deceased. It was taken by agreement of the parties, claimant waiving service of notice of taking of the deposition. On March 12, 1964, claimant filed an objection to the introduction of the deposition on the ground that the case had already been submitted subject to the introduction of medical depositions and was therefore untimely offered. Petitioners responded that the deposition of Wright was introduced for the purpose of showing that deceased did not "unload blocks from the truck to a platform on the day of his death"; that claimant was assuming in the hypothetical question propounded to her doctors that the witness Homer Chadwick had testified that Virgil F. Phillips unloaded blocks from the truck to a platform * * * *."; and "we did not so interpret the testimony of Homer Chadwick."

On March 22, 1964, petitioners introduced the depositions of Wright, Dr. B and Dr. S. Claimant objected to the deposition of Wright on the same ground as in her written objection. Petitioners again contended that the deposition of Wright was to show that "Bobby Wright handled all the blocks from the truck to the scaffold and that deceased, Phillips, did not handle any of them." The trial judge sustained claimant's objection and refused to admit the deposition of Wright.

Claimant at this time also introduced into evidence the written report of Dr. F based upon the exact hypothetical question propounded to Dr. R. Petitioners did not object to the report of Dr. F.

Dr. B, for petitioners, testified that he had read the deposition of Chadwick, the weather report, and had seen the pictures introduced by petitioners. Then the following question was asked by petitioners:

"* * * Doctor, assuming, that Virgil Phillips, who is deceased, was working as was described and testified to by Homer F. Chadwick in the deposition which you have read, both on the day that he died and as to the work that he had been doing up to the time of his death, assuming that that's true, * * * state whether you have an opinion as to whether the work this man was doing on the day that he became sick and died, was the cause of his death. * * *"

Dr. B testified that in his opinion the work deceased was doing had nothing to do with his death, "that he died from natural causes."

On cross-examination, Dr. B testified that in his opinion "it would take more physical exertion with a hoe than a cement mixer" and that "his energy might have been greater under this temperature."

Dr. S, for petitioners, testified that he had seen the weather report, the pictures and had read the deposition of Homer Chadwick.

"BY MR. SHELTON:

"Q. Assuming that the testimony here of Mr. Chadwick's is reasonably accurate and true, doctor * * * do you have an opinion as to whether or not the work Mr. Phillips was doing at the time he became sick, caused his death?"

Dr. S stated his opinion was that the work deceased did had nothing to do with his death.

On cross-examination the following occurred:

"Q. Now, all you know about this case is what you read in the deposition of Mr. Chadwick?

"A. Yes."

Dr. F, for claimant, in answer to the hypothetical question, stated that in his opinion, "the physical activity performed while on the job, coupled with the heat was the contributing cause of the coronary occlusion; which resulted in myocardial infarction from which his death was the direct result."

On April 1, 1964, the trial judge entered an order finding, among other things that deceased sustained an accidental personal injury arising out of and in the course of his employment consisting of "injury to his heart and as a result thereof, Virgil F. Phillips died on August 12, 1963"; and awarded claimant $13,500.00 as the sole dependent heir of deceased. The award was affirmed by the court en banc on May 4, 1964.

Petitioners made a timely appeal from that order to this court and, for vacation of the same, advance the following two propositions:

"1. The order of the State Industrial Court should be vacated because it is not reasonably supported by sufficient competent evidence.

"A. The medical evidence of the claimant was not based upon the facts and circumstances as shown by the proof.

"B. That claimant's evidence is insufficient to show any strain or exer-

tion capable of producing the deceased's death.

"2. The order of the State Industrial Court should be vacated because the court erroneously refused to admit competent evidence relevant to the incompetency of claimant's expert medical evidence."

On August 4, 1964, petitioners filed a motion before this court to "correct case made" by making the deposition of Wright a part of the transcript. On August 21, 1964, this Court ordered the lower court to correct the transcript "nunc pro tunc by including therein the excluded deposition." On September 8, 1964, a hearing was held before the trial judge in keeping with this Court's order and on September 9, 1964, the trial judge entered an order making the deposition of Wright "a part of the case made" and ordered it filed in this Court.

The widow's claim was predicated upon an accidental injury to the heart of deceased from work-connected exertion and strain allegedly suffered by deceased on the day of his death when he mixed mortar by hand with a hoe and pulled buckets of said mortar up to an eight foot scaffold by rope and pulley in 100 degree F. plus weather.

■ The pattern of proof necessary to establish an accidental injury from work-connected strain or exertion consists of two essential elements: (1) lay testimony as to the nature of labor performed by the workman when the injury occurred; and (2) expert opinion that the exertion attendant upon such activity as shown by evidence was sufficient to, and did produce, the strain to which disability or death is sought to be ascribed. Only when both of these evidentiary components are supplied may the fact of an accidental injury from strain be established. Lea Machinery Co. v. Emmons, Okl., 395 P.2d 857; Berryhill v. Prudential Premium Co., Okl., 394 P.2d 520; Black, Sivalls & Bryson, Inc., v. Coley, Okl., 367 P.2d 1017.

Homer Chadwick's testimony stands uncontradicted, that on the day in question it was hot (his testimony was that the temperature was from 103 degrees F. to 104 degrees F. The weather bureau report at Will Rogers Airport was 100 degrees F.); that deceased wheeled sand in a wheelbarrow from a certain pile of sand to the location where he mixed the mortar in another wheelbarrow; that he added cement with the sand either by the shovel or by picking up a 50 pound sack of cement and pouring it into the wheelbarrow; that the water was added and he mixed the sand, cement and water together to form mortar by "a chopping" motion with a hoe; that deceased put two to three shovels of the finished mortar into a five gallon bucket and that the shovels of mortar weighed approximately 15 to 20 pounds; that he then pulled 12 to 14 of the bucketfuls up to the eight foot scaffold by hand with rope and pulley; that deceased would place some cement blocks upon the scaffold and that the blocks weighed 30 or 35 pounds; that deceased did not normally mix mortar with a hoe but with a mixing machine.

While petitioners contend Chadwick was uncertain as to who handled the cement blocks, we feel there is no uncertainty about his testimony as to it being a hot day and that deceased did not normally mix mortar with a hoe. Also the record is completely silent as to deceased ever before raising buckets of mortar up to an eight foot scaffold and the petitioners do not question this activity as being unusual or excessive for the deceased.

■ We think there is competent evidence to show that deceased's activities were unusual for him and required extra physical effort, exertion and strain on his part.

Drs. R and F both testified that in their opinions the excessive and unusual strain on his heart and vascular system, coupled with the increased ambient temperature, produced a coronary occlusion resulting in a myocardial infarction which caused deceased's death.

We hold from the evidence that the two elements of proof above referred to have

been supplied and the factum of an accidental injury from strain and exertion has been established

Petitioners argue that claimant's medical is incomplete and insufficient to support the lower tribunal's award because Drs. R and F based their opinions on a hypothetical question which "clearly assumes facts which were not in evidence and omits other pertinent facts", and refers to the following part of said question. to-wit:

"He had unloaded, by hand, with the assistance of another worker 100 to 150 cement blocks weighing from 30 to 35 pounds each from a truck bed approximately 4 feet high, up to an 8 foot scaffold, for a distance of 4 feet lift for each block * * *."

■ We find no unfair selection of the facts in proof or omission of material facts in evidence as to require the rejection of the testimony of Drs. R and F because of the hypothetical question challenged by petitioners.

■ In Ada Coca-Cola Bottling Co. v. Asbury, 206 Okl. 269, 242 P.2d 417, we said in paragraph two of the syllabus:

"A hypothetical question is sufficient if it fairly states such facts in evidence as are relevant and material and sufficient to the formation of an accurate opinion by the witness. It is not an improper question because of an omission of undisputed facts when such facts are not material and essential to the formation of an intelligent opinion covering the matter in question."

■ Hypothetical questions must be based upon facts as to which there is such evidence that a jury might reasonably find that they are established; but it is not necessary that the fact be clearly proved. Oklahoma Gas & Electric Co. v. Oliphant, 172 Okl. 635, 45 P.2d 1077.

While the facts objected to by petitioners in the hypothetical question were not clearly established, we think they were sufficiently established, along with other uncontradicted material facts, to bring the question well within the above rules and was sufficient for the formation of an accurate opinion by the witnesses predicated upon a set of facts substantially in the nature disclosed by the evidence at the hearing.

Also the testimony of Drs. B and S for petitioners shows that it was also based solely on the testimony of Homer Chadwick in his deposition. In fact a portion of Dr. B's testimony was as follows:

"Q. (by Mr. Shelton): Now, you understand from the testimony here that he also shoveled sand and cement and lifted cement and lifted, probably, some blocks and did other work on this particular day.

"A. I understand that."

The testimony of the doctors, while based upon substantially the same set of facts, is in conflict.

■ In the case of Hopkins v. Gibson, Okl., 395 P.2d 790, and many other cases too numerous to cite, we said:

"The State Industrial Court is the sole judge of the credibility of witnesses, be they lay or expert, appearing before it, and of the weight and value to be accorded to their testimony."

■ Whether a heart attack suffered by a workman resulted from strain and exertion arising out of and in the course of his employment or from other causes which are unrelated thereto and disconnected therefrom, presents a question of fact for the determination of the State Industrial Court, whose findings on such issue will not be disturbed on review when based on competent evidence reasonably tending to support it. Lea Machinery Co. v. Emmons, supra; The Hefner Co. v. Lantz, Okl., 393 P.2d 845.

■ We hold there is competent evidence to support the finding of the lower court that deceased did sustain a heart attack arising out of and in the course of his employment which resulted in his death.

Petitioners second contention is that when the lower court excluded the deposition of

Wright it resulted in such substantial prejudice to their rights as to constitute an abuse of the trial court's discretion. They admit "that it may have been more appropriate to have taken the deposition of witness Wright prior to the initial hearing on January 22. However, in order to be so timely, the petitioners would have had to anticipate the hypothetical question submitted to the claimant's doctors was going to be based upon assumption not substantiated by the record. This would be an onerous burden indeed."

This argument is not tenable. Petitioners knew deceased was sick on the job on August 12, 1963, and that he died on the same day; they knew his widow filed a claim for benefits on August 27, 1963; they were in attendance and took part in the taking of the deposition of Homer Chadwick on January 8, 1964; they heard all of the claimant's evidence, with the exception of Dr. R's report, at the hearing before the trial judge on January 22, 1964; they took the depositions of their doctors on January 30, 1964, predicating the doctors' opinions on the testimony of Chadwick; and not until February 27, 1964, did petitioners take the deposition of Wright. They could have anticipated on January 8, 1964, upon the taking of Chadwick's deposition, that claimant's medical would probably be based on a hypothetical question formed from Chadwick's testimony, and if they did not so anticipate the same, they *knew* on January 22, 1964, at the hearing that the hypothetical question submitted was based on Chadwick's testimony. Even though they then knew, petitioners did not notify the court or indicate in any way that they wanted to introduce any lay testimony or rebuttal evidence but said:

"Mr. Shelton: Let the record show, if the Court please, that we have leave to submit medical testimony by deposition, before we rest our case.

"The Court: It is so ordered."

We hold that, on the basis of the record, petitioners rested their case, with the exception of their medical testimony, at that time, on January 22, 1964.

A request to reopen a case for the introduction of additional evidence is addressed largely to the sound discretion of the court, and its ruling thereon will not be disturbed by the appellate court, unless it clearly appears that the trial court abused it discretion. McCall v. Duff, Okl., 385 P. 2d 916; Cales v. Rushing, Okl., 321 P.2d 404; White v. City Bank of Norman, Okl., 271 P.2d 713.

In the syllabus by this Court in the case of Baker v. Baker, Okl., 386 P.2d 753, we said:

"Ordinarily absent an abuse of discretion, the action of the trial court, in denying request to reopen trial and present testimony of rebutting effect as to an issue only incidentally pertinent and material, should not be reversed."

In the case at bar petitioners represent that the main reason for their wanting the deposition of Wright in evidence was to show "that Bobby Wright handled all the blocks * * * and that the deceased Phillips, did not handle any of them"; and yet petitioners, in questioning their own Dr. B, stated "now, you understood from the testimony here that he also shoveled sand and cement and lifted cement and lifted, probably, some blocks * * *."

We fail to see where the petitioners have been prejudiced by the refusal of the lower court to admit the deposition of Wright into evidence; and we hold that the lower court did not abuse its discretion in refusing its admission.

As we have found no errors of law and that the order of the State Industrial Court is amply supported by the evidence, the award is sustained.

JACKSON, V. C. J., and DAVISON, WILLIAMS, IRWIN and BERRY, JJ., concur.