**CITY OF DUNCAN, Own Risk, Petitioner,**

v.

**Alpha Mae SAGER, and the State Industrial Court, Respondents,**

**In the Matter of the Death of Arthur Sager, Deceased.**

**No. 42546.**

Supreme Court of Oklahoma.

Oct. 15, 1968.

B. J. Cooper, Rinehart, Morrison & Cooper, Oklahoma City, for petitioner.

Kerr & Moslander, Oklahoma City, G. T. Blankenship, Atty. Gen., for respondents.

LAVENDER, Justice.

There is involved here for review an award of the State Industrial Court, sitting en banc, allowing the respondent Alpha Mae Sager, claimant below as the surviving

widow and mother of the surviving children of Arthur Sager, deceased, an award for death benefits under the provisions of the Oklahoma Workmen's Compensation Act. Parties will be referred to as they appeared before the State Industrial Court. The deceased Arthur Sager will be referred to as "deceased."

The trial judge entered an order denying the claim. Claimant prosecuted an appeal to the State Industrial Court sitting en banc. The court sitting en banc vacated the order of the trial judge and entered an award in favor of the claimant. Respondent prosecutes this appeal seeking a vacation of the award entered by the court sitting en banc and a reinstatement of the order of the trial judge denying the claim.

Deceased was employed by respondent as a street sweeper during the month of May, 1966. The evidence establishes that while working on May 12, 1966, claimant hit the back end of the street sweeping unit with the top of his head and on May 18, 1966, while working, sustained a second injury when a lid on the unit fell again striking the top of his head. He did not work after May 18, 1966.

During the following month deceased received medical treatment in medical clinics and hospitals. He was admitted to the hospital on June 23, 1966, "for evaluation of pain in the neck, headaches, and 'spells' which he relates to being hit on the head on two occasions while at work." Dr. R. in his final hospital report states, "This patient deteriorated very rapidly following his hospitalization. It was apparent that his bizarre behavior was probably organic, and bilateral cerebral angiograms were done on June 27, 1966, with findings of a right temporal lobe space taking lesion. On June 28, 1966, a right temporal osteoplastic craniotomy was done, with aspiration biopsy of a glioblastoma multiforme of the right temporal lobe. The patient continued comatose following surgery and expired at 5:58 A.M. on June 30, 1966. An autopsy was not obtained. FINAL HOSPITAL DIAGNOSIS: Glioblastoma multiforme, right temporal lobe. Doctors explained that in lay terms a diagnosis of "glioblastoma" to be a "malignant brain tumor, or cancer."

In establishing a causal connection between the alleged injury and the death of the deceased, claimant submitted in evidence the deposition of Dr. S., testifying in answer to a hypothetical question.

Respondent's sole contention on appeal to this court is that "in answering the hypothetical question, Dr. S. assumed and supplied material facts neither in the hypothetical question nor in the evidence, therefore, his testimony has no probative value and is incompetent."

Respondents argue that without the testimony of Dr. S. no causal connection was established between the death of the deceased and the alleged accidents, therefore the trial judge was correct in denying the claim. Respondents concede that if no error was committed in the admission of the testimony of Dr. S., the evidence is sufficient to establish the claim of the claimant and the award entered by the State Industrial Court en banc is correct.

The hypothetical question submitted to Dr. S. is as follows:

"Assuming that a man 47 years of age, having had no previous history of any severe headaches, during the first two weeks of May, 1966, injured his head on two different occasions.

"According to the history given his attending physician, Dr. E. C. Lindley, of Duncan, he became startled, jumped up and hit the back end of the city street sweeper with the top of his head. About a week later a steel lid on the street sweeper fell down and hit him in the top of the head, buckling his knees, and he required assistance by a fellow employee to move to a spot where he could sit down and rest. The last occurrence was most probably on May 12. He entered the hospital on May 23, suffering from terrific headaches and was very slow to respond to any medication. He was released from the hospital on June 3, with some relief from a neck brace which had

been fitted. He reentered the hospital on June 18 with the same complaints. He was released from the hospital on June 22 with his condition unchanged. Although this man did not enter the hospital until May 23, he reported to the clinic on May 13 with headaches and backaches. The day after being released from the hospital at Duncan, with his condition unchanged, he entered the Wichita Falls General Hospital on or about June 23, under the care of Dr. R. a Neurologist. He deteriorated very rapidly following his hospitalization, with bizarre behavior and bilateral cerebral angiograms were done on June 27, with findings of a right temporal lobe lesion. On June 28 a right temporal osteoplastic craniotomy was done with an aspiration biopsy of a glioblastoma multiforme of the right temporal lobe. He continued comatose following surgery and expired at 5:58 A.M. on June 30, 1966. An autopsy was not obtained."

Respondent's objection to the answering of the question is as follows:

"MR. COOPER: At this time, we will object to the hypothesis propounded as a basis for the answer, inasmuch as the same does not include all the facts material to this case that are in evidence at this time by way of the depositions of Dr. L. and the hospital records attached as exhibits to said deposition. It further presumes facts that are not in evidence and therefore does not constitute a proper hypothesis for an opinion to be given by this doctor as to any of the issues in this case."

The answer of Dr. S. to the question is as follows:

"It is my opinion that the blow on top of the head during the first two weeks of May, 1966, his head first hitting the back end of a city street sweeper while at work and about a week later, the additional blow from a steel lid on the street sweeper which fell on him caused a cerebral hemorrhage and caused his death on June 30, 1966. Although the hemorrhage was superimposed upon an underlying neoplasm, it is reasonable and probable, and within the realm of reasonable medical probability that he might have lived several years had it not been for the two instances of trauma causing the hemorrhage, and that had it not been for this untimely death, he could have remained active and capable of continuing his manual labor for these years."

In his objection made at the trial counsel for respondent refers to the deposition of Dr. L. and hospital records attached thereto. In his brief he contends that Dr. S. "assumed the fact of a hemorrhage when there was no evidence of any hemorrhage or symptoms to support a finding of hemorrhage." The laboratory report of Dr. A., a pathologist, a part of the hospital records relating to a miscroscopic examination of small fragments of brain tissue taken from the brain of the deceased during surgery, states, "fragmental biopsy pieces show brain tissue and clotted blood" and in discussing the brain tumor states, "The tumor consists of a fairly cellular tissue showing marked interstitial blood." The report relates, "There was a trace of occult blood."

Dr. S. testified that as the deceased sustained two blows on the head at a time when he had a malignant tumor in the right lobe of his brain, it might be assumed from a medical standpoint that he sustained a hemorrhage.

Respondent urges that while the hypothetical question refers to the deceased as having "terrific headaches" upon admission to the hospital on May 23, 1966, it does not include facts relating to his having suffered headaches sometime during the month of April, 1966, and prior to his having received either of the blows on his head. One Marion Eely testified that sometime during the month of April, when he and deceased were attending a "dog roundup," the deceased complained of being "sick at his stomach" and having a headache. It was not necessary to include these unrelated facts in the hypothetical question. As to whether the headache related to the

tumor or to the sick stomach of the deceased is not shown by the evidence and is speculative.

During his cross-examination of Dr. S., counsel for respondent challenged the statement of the doctor that paralysis of the deceased likely occurred as a result of the hemorrhage. He attempted to impeach the testimony of the doctor on the theory that as the medical record does not establish the existence of paralysis the hemorrhage did not occur. The hypothetical question states that the deceased "continued comatose following surgery" until his death a few days later. "Coma" means a state of profound insensibility. Webster's Dictionary. Dr. S., based on his medical experience, testified that he assumed the deceased was paralyzed during the last few days of his life, but that examining doctors might not be able to make a definite finding of paralysis because of the weakened condition of the patient. Dr. S. also testified that the claimant's sudden onset of headaches subsequent to the blows to his head indicated sudden hemorrhage and the resulting increased pressure. There is no merit to the respondent's contention.

In Oklahoma Ordnance Works Authority et al. v. Garrison et al. (1967), Okl., 424 P.2d 983, we said:

"A hypothetical question is sufficient if it fairly states such facts in evidence as are relevant and material and sufficient to the formation of an accurate opinion by the expert witness. The question is not made improper by omission of undisputed facts when such facts are immaterial and are not essential to the formation of an intelligent opinion on the matter in question."

To the same effect see C. T. Hughes Construction Company v. Phillips (1965), Okl., 401 P.2d 498, and Ada Coca-Cola Bottling Co. v. Asbury (1952), 206 Okl. 269, 242 P.2d 417.

We have held in several cases that hypothetical questions must be based upon facts as to which there is such evidence that the triers of the facts might reasonably find have been established but it is not necessary that such facts be clearly proved. C. T. Hughes Construction Company v. Phillips, supra; Oklahoma Gas & Electric Co. v. Oliphant (1935), 172 Okl. 635, 45 P.2d 1077; Mead Bros. v. Watts (1928), 135 Okl. 23, 273 P. 207.

"Rational inferences deducible from testimony, as well as positive evidence itself, may form the basis for hypothetical questions." Connelly v. Jennings (1952), 207 Okl. 554, 252 P.2d 133; Teeters v. Frost (1930), 145 Okl. 273, 292 P. 356, 71 A.L.R. 179.

We have reviewed the record. The hypothetical question propounded to Dr. S. and his answer thereto is sufficiently supported by the evidence and the rational inferences therefrom.

The medical evidence is conflicting but supported by the testimony of Dr. S. amply sustains the award entered by the State Industrial Court sitting en banc in favor of the claimant.

It is sustained and affirmed.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD, HODGES and McINERNEY, JJ., concur.